357 So.2d 333 (1978)
CITIES SERVICE OIL COMPANY, a corporation
v.
Thomas F. GRIFFIN.
SC 2505.
Supreme Court of Alabama.
April 7, 1978.
*335 John H. Morrow, Birmingham, Barry N. McCrary, Talladega, for appellant.
Robert S. Vance and James N. Brown, III, Birmingham, for appellee.
BEATTY, Justice.
This is an appeal by Cities Service Oil Company (Citgo) from a judgment entered against it based upon a jury verdict awarding the plaintiff, Griffin, $70,000.00 damages. We affirm.
The plaintiff filed this action obviously intending to charge Citgo with legal fraud as it is defined under Tit. 7, § 108, Alabama Code (Recomp.1958) (now Code of 1975, § 6-5-101):
Misrepresentations of a material fact, made wilfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently, and acted on by the opposite party, constitute legal fraud.
His complaint included the following allegations:

. . . . .
3. That prior to, to-wit, June 1, 1972, plaintiff learned that defendant Cities Service was terminating some of its smaller distributors in other states.
4. That on or about June 1, 1972, and from time to time thereafter until to-wit, October 1, 1972, plaintiff inquired of defendant Cities Service whether his distributorship would be terminated.
5. That at the time of plaintiff's said inquiries, defendant Cities Service, by and through its agents or employees, made representations to plaintiff to the effect that plaintiff had no reason to worry regarding being cut-off or terminated by Cities Service, but would retain his said distributorship.
6. That the representations in the above paragraph made by defendant Cities Service were false and that defendant Cities Service knew that they were false.
7. That at the time of plaintiff's aforesaid inquiries to defendant, plaintiff's distribution business was a profitable, valuable and readily saleable business and that plaintiff then had the capacity or opportunity to make arrangements for the distribution of competing petroleum products; but that shortly after October 1, 1972, plaintiff's said opportunity to make other supply arrangements was no longer available, the business was no longer saleable and plaintiff was then unable to make arrangements for the distribution of competing petroleum products.
8. That plaintiff believed the aforesaid representations of defendant, Cities Service, and relied upon said representations and in reliance thereon continued doing business with Cities Service, continued selling said defendant's products as a branded distributor, did not sell his said business and did not make arrangements for the distribution of competing petroleum products.
9. That on or about the 10th day of October, 1972, defendant Cities Service *336 informed plaintiff that Cities Service was exercising its option to terminate plaintiff's contract with defendant Cities Service in accordance with the terms of the March 9, 1972 contract, and that on or about October 24, 1972, plaintiff received a registered letter dated October 18, 1972, formally terminating his contract as of, to-wit, March 1, 1972; that thereafter one Bob Moore, Cities Service's agent and its Marketing Vice President represented to plaintiff that Cities Service would not let anyone else in plaintiff's sales area before plaintiff was able to effect a sale of his business.
10. That subsequent to the conversation between Bob Moore and plaintiff, but before Plaintiff had been able to sell his business, defendant Cities Service and defendants Boone Oil Company and D. C. Boone entered into an arrangement or agreement under which defendants Boone Oil Company and D. C. Boone moved into plaintiff's sales area, set up Cities Service branded dealers and otherwise interfered with the contract and business relationship between Cities Service and plaintiff, and between plaintiff and retail dealers who had theretofore purchased petroleum products from plaintiff.
11. That the aforesaid representations made by the said Bob Moore, acting as an agent for defendant Cities Service, were false and were known by said defendant to be false or were made by said defendant without knowledge of the true facts, recklessly for the purpose of deceiving plaintiff.
12. Plaintiff believed the representations made by Cities Service's agent, Bob Moore, and in reliance upon said facts, did not sell his business prior to the time defendants Boone Oil Company and D. C. Boone moved into plaintiff's sales area.

. . . . .
The record discloses that Griffin became the distributor of Cities Service products in Talladega and St. Clair Counties in 1947 under a series of standard year-to-year contracts. These contracts did not renew if either party gave the other written notice of non-renewal at least 120 days before expiration. On the contract in question the renewal date was March 1, 1973.
Citgo had formulated a new marketing policy in 1971 which, when implemented, would reduce the number of their distributorships, including that of Griffin. In the summer of 1972 the company experienced supply shortages and began to implement the new program. Having become aware of some distributorship cancellations in other areas, about March of that year Griffin made inquiries to Citgo representatives on the possibility of his contract being terminated. In response he was given assurances of contract renewal. However, on or about October 10, 1972 he was told by Ira Hughes, a Citgo employee, that his contract would not be renewed, and this was followed "a few days" after October 19, 1972 by a written notice to Griffin from Citgo of its election not to renew their distributorship contract. When he received this notice Griffin immediately contacted Bob Moore, the marketing vice-president of Citgo, concerning that decision. Griffin expressed to Moore his concern over the possibility of other people coming into his territory in competition with him before he had an opportunity to sell his business. A couple of weeks later (approximately November 4) he was assured by Moore that such a situation would not occur. Nevertheless, about two weeks later (approximately November 18) Citgo signs were being displayed in his territory by other dealers who were selling gasoline for less than Griffin's dealers were selling it. Thereafter his attempts to obtain another source of supply were unsuccessful due to the gasoline shortage, and the value of his business was harmed. Ultimately he sold his business for the aggregate amount of $32,000.00, although during the previous summer and up to October it had been worth $100,000.00, calculated by an industry-recognized method of valuation which allowed $1.50 per monthly gallon.
The trial court denied Citgo's motion for a directed verdict and its motion for judgment N.O.V., in both of which Citgo maintained *337 that the fraud claim was barred by the statute of limitations of one year. We quote from the defendant's motion for a directed verdict:

. . . . .
7. Any effort to recover on any claimed misrepresentation made by this defendant fails because the evidence establishes without dispute that plaintiff knew of the falsity of such claimed misrepresentation more than one year prior to the commencement of this action.
8. Any effort on the plaintiff's part to recover on the basis that the defendant represented that plaintiff's contract would be renewed is defeated by the statute of limitations of one year because the complaint and the evidence show without dispute that plaintiff learned the defendant was not going to renew its contract more than one year prior to the commencement of this action.

. . . . .
And the following grounds were asserted in the defendant's motion for judgment N.O.V.:
7. Any effort to recover on any claimed misrepresentation made by this defendant fails because the evidence establishes without dispute that plaintiff knew of the falsity of such claimed misrepresentation more than one year prior to the commencement of this action.
8. Any effort on the plaintiff's part to recover on the basis that the defendant represented that plaintiff's contract would be renewed is defeated by the statute of limitations of one year because the complaint and the evidence show without dispute that plaintiff learned the defendant was not going to renew its contract more than one year prior to the commencement of this action.
. . . . .
17. The evidence established without dispute that plaintiff knew of the falsity of the representation on which plaintiff based his suit more than one year prior to the commencement of plaintiff's suit.

. . . . .
It is Citgo's position that Griffin's action for misrepresentation fails because of the application of Tit. 7, § 42, Alabama Code (Recomp.1958) (now Code of 1975, § 6-2-3):
In actions seeking relief on the ground of fraud where the statute has created a bar, the cause of action must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have one year within which to prosecute his suit.
As the defendant insists, it is well settled that an action based upon fraudulent misrepresentation must be brought within one year of the discovery thereof or within one year of the time when it should have been discovered. Johnson v. Shenandoah Life Insurance Co., 291 Ala. 389, 281 So.2d 636 (1973); State Security Life Insurance Co. v. Henson, 288 Ala. 497, 262 So.2d 745 (1972).
When did the plaintiff discover that the defendant's representations to him were fraudulent? The defendant contends that the plaintiff knew of the misrepresentations with regard to the termination of his distributorship no later than October 10, 1972. Because the action was not brought until October 18, 1973, defendant maintains that it is barred by § 42. If there was no evidence supporting an inference that plaintiff's discovery of the fraud occurred after October 18, 1973, a jury question would not have been established and the defendant would have been entitled to a directed verdict. That is, if the evidence showed without conflict that more than one year before October 18, 1973 Griffin had knowledge of facts sufficient to put a prudent man on inquiry, which in the exercise of proper prudence and diligence would have enabled him to learn of the fraud, a directed verdict would have been proper. State Security Life Insurance Co. v. Henson, supra. On that issue we quote from the record:
Q. Now at anytime prior to this October 3, 1972, day had they told you anything about any problem you were going to have with your distributorship?
*338 A. No, sir. Not a thing.
Q. Was this note that he gave you on October 3rd after he told you that there was no way you had anything to worry aboutthat you had been with the company too long?
A. Yes, sir.
Q. I'll show you, Mr. Griffin, what's been marked as Plaintiff's Exhibit No. 17 which is a letter from Mr. Kumpe to Mr. Oltman telling about the test that they used in figuring out that they were going to fire you or cut off your contract?
A. Yes.
Q. Did you know anything about any of these tests? Have you ever been advised by Cities Service anything about this what they call a criteria?
A. No, sir.
Q. Did you know at the time that any such letter as this
A. No, sir. I didn't even know there was a letter like that.
Q. Did you know that any consideration was being given to cutting you off?
A. No, sir.
Q. Had anybody connected with Cities Service said anything to you about suggesting that that was even being considered?
A. No, sir.
Q. And you had asked how many times in all?
A. Three to five, several.
Q. And you did finally get some communication from them I believeI believe the first communication was not written was it?
A. That's right.
Q. And who told you what was going to happen?
A. Ira Hughes.
Q. That was about when?
A. About October 10 or something like that.
Q. How did that come about?
A. He called me the day before and said thatcould I meet him at Holiday Inn in Riverside in the morning. I said yes what time. He said about seven or seven-thirty. I met him up there. He told me that they weren't going to renew the contract.
Q. Didn't tell you anything about why?
A. No, he didn't say why? He just said they weren't going to renew the contract, and he said they weren't going to renew the contract, and he did mention supply, but that was it. That's all he said.
Q. Alright, now onyou got a certified letter onyou remember what date you got it on? It's dated the 19th.
A. No, sir. I don't.
Q. You know about how long after the 19th it was?
A. It was probablycoming from Atlanta probably two days, three.
Q. Alright, sir. This is the letter where you were actually cut off.
A. Yes, sir.
Q. In October the shortage with Cities had already begun hadn't it?
A. Yes, sir.
Q. And this letter that has been introduced, Plaintiff's Exhibit No. 17, Mr. Griffin, the last thing that Mr. Kumpe said was that it is hopeful by using this approach we will be able to allocate sufficient products to our `Class A' account to afford them normal growth during the product shortage. Now had anyone eve[r] told you what a `Class A' account was?
A. No, sir.
Q. Class B account or a Class C account?
A. No, sir.
Q. You didn't know you were a `C' grade business man?
A. No.
We believe this exchange furnishes a scintilla of evidence that Griffin was not put on inquiry until "a few days" after October 19, when he received the certified letter which actually "cut him off." Prior to that time he had been given both oral assurances of continuance and written encouragement to increase his sales. In fact, he had been placed on a supply allocation under his existing printed sales contract which he signed in early March, 1972. In *339 view of the nature of these prior dealings, it is a fair inference that any "notice" of the misrepresentations upon which a prudent person would have relied would have come to him through written, as opposed to oral, notice. This made the case one for the jury. Mitchell Homes, Inc. v. Tew, 294 Ala. 515, 319 So.2d 258 (1975).
In addition, we should point out that under the plaintiff's allegations he was also relying upon another misrepresentation. Again we refer to the evidence:
Q. What did you do when you got this letter terminating your contract?
A. Well, I immediately went to the went over and called Bob Moore.
Q. And he's the man you said you knew in Tulsa?
A. Yes, sir.
Q. And what conversation did you have with him?
A. I called Bob and I asked himI said, `What's going on?' He said that he didn't know, said that he would call me back in a couple of weeks. I think he was going to be out of the state or out of the country or something, and he'd call me back in a couple of weeks and let me know and find out about it. So, in a couple of weeks he did call me back.
Q. What did he say to you at that time?
A. He said that he didn'twell he said that he was sorry about it, but said he was paying those people in Atlanta to run the business and he was going to let them run it and I said well what about a supply until thenuntil I can do somethinghe said that well you'll get a supply. I said, `Well, one of the things I'm primarily worried about is people coming into my territory, displaying a sign with a cheap price before I can make another connection or sell the business.' He said, `Well, our association has been too long and too cordial for that to happen.' Said, `That won't happen.'
Q. Alright, now let me get straight here just a minute. You have explained to us about branded and unbranded dealers?
A. Yes.
Q. All of your dealers were what?
A. Branded.
Q. You didn't have any cut-rate dealers or unbranded dealers?
A. No.
Q. So, everyone of them had Citgo signs out in front of their places.
A. Right.
Q. Nobody else in your two county area had Citgo signs at all except the dealers that you had developed? Is that right?
A. Yes, sir.
Q. And these dealers honored Citgo credit cards. Did they not?
A. Yes, sir.
A. Yes, sir.
Q. Alright, was anything else to the conversation with Mr. Moore at that time?
A. No, that was about it.
Q. Now you had 120 days left on the contract when the notice was givenor from the first of the next monthso you had that period of time left to operate anyway did you not?
A. Yes, sir.
Q. What if anything happened with respect to other people coming in your territory?
A. Well, shortly thereafter there was a Citgo sign displayed down on Battle Street and Coosa Street or 17th Street with a real low price.
Q. Now is that a dealer that you had?
A. No, sir.
Q. Who was supplying that dealer if you know?
A. I think Mr. Boone was supplying that dealer.
Q. And at what price was gasoline offereddo you know whether Mr. Boone had been buying gas before up at Triangle?
A. I don't know.
Q. You've already testified that Citgo was selling to the unbranded dealers?
A. Yes, sir.
Q. Just as they were selling to you?
A. Yes, sir.

*340 Q. [a]lright, at what price was that station selling gasoline compared to the price that your other branded stations were selling gasoline?
MR. CLEVELAND: Judge, I object to that. The price that a filling station operator would be selling gas would not be material to anything Mr. Boone would be doing. He was not operating that filling station.
THE COURT: I overrule the objection.
A. Relative to my service station prices?
Q. Yes.
A. They were selling gasoline for about as I remember it about a cent and a half or two cents about two cents more than my dealers were paying for it.
Q. Alright, now how does that compare with what your dealers were getting for it?
A. Well, it would be about four cents cheaper.
Q. Alright.
A. The gasoline on Battle Street would be selling from four to five cents a gallon cheaper than my dealers were selling it.
Q. How long was this after your conversation with Mr. Moore?
A. I believe that was about two weeks.
Q. So within two weeks you saw Citgo signs go up at stations underselling your stations by four to five cents?
A. Right.
Q. Was that the only one that went up like that?
A. I think there was another one out on the Ashland Highway. That was the one that hurt me the worse.
Q. Mr. Griffin, does this type of thing have an effect on the value of your business?
A. Sure. Certainly.
Q. Were you able to continue to selling dealers the same price with them being undersold four or five cents?
A. I couldn't have very long. Only way I could at all was to tell them we were going to do something in a week or two.
Q. Did you take any steps to try to either get rid of your business or do anything else to take care of the situation?
A. Yes, sir. Q. What did you do?
A. I heard that Mobil Oil had been wanting to come into Alabama so I called Mobil. And they sent a man out and looked at my stations and looked at the whole setup, a man named Hurt, Glenn Hurt.
Q. Alright, now let me ask you this. Were you able to make a deal for any alternative source of supply for branded gasoline?
A. No, sir.
Q. Now at that time after the shortage had begun and with other folks underselling what if anything did that have to do to the value of your business as a going business?
MR. MORROW: We object to that question. It assumes certain facts in that question.
THE COURT: Overrule.
A. Now let's get the question.
Q. Would you read it back please?
COURT REPORTER: Now at that time after the shortage had begun and with other folks underselling what if anything did that have to do with the value of your business as a going business?
A. Well, it hurt it. I knew I couldn't sell the business except to somebody thenI couldn't get a supply for it. I couldn't get any other supplier to take it on. And I knew that the only alternative I had would be to sell to a competitor.
As we have previously indicated and as this testimony discloses, Griffin did not know of and was not put upon inquiry concerning this particular misrepresentation until about November 18, 1972, or eleven months before the date upon which this action was filed. And because the quoted testimony would have allowed the jury to believe that Griffin's loss was due to this misrepresentation of Moore, a directed verdict would have been improper.
Citgo also contends that the trial court erred when it instructed the jury that Citgo had to satisfy the jury that the plaintiff's *341 claim was barred by the statute of limitations.
Under our decisions, when the statute of limitations is a defense the plaintiff has the burden of proving that the cause of action accrued within the period of the bar. Hatch v. Black Diamond Coal Mining Co., 253 Ala. 495, 45 So.2d 291 (1950). The record does disclose that, initially, the trial court charged on the burden improperly:
And of course since the Defendant Cities Services entered that plea in answer to the charges by the Plaintiff then the burden as far as that point is concerned and that is the statute of limitations to this action the burden to prove that to reasonably you [sic] by the evidence of the truthfulness of thatthat burden is upon the Defendant Cities Services.
Immediately following this portion of the oral charge, however, the trial court continued:
Now as to the defense of the Statute of Limitations the Defendants by their plea of that statute of limitations the Defendant Cities Services contends that the Plaintiff is not entitled to recover in this case because the Plaintiff's claim is barred by the statute of limitations of one year. The burden is upon the Plaintiff to reasonably satisfy you by the evidence that this action was commenced within one year from the accruel [sic] of the Plaintiff's right of action and this action was commenced in this case by the filing of the complaint here on the 23rd [later corrected to the 18th of October] day of October, 1973.
It is of course obvious that the first portion of this aspect of the oral charge contained an erroneous reference to the burden of proof. However, it is equally obvious that the trial court's further and more lengthy references to the same subject accurately stated the legal principle. In view of this corrective action, and having reviewed the oral instructions as a whole, we cannot conclude that the defendant was prejudiced. Wren v. Blackburn, 293 Ala. 393, 304 So.2d 187 (1974). Had the defendant been concerned that the jury might have been misled or confused by the portion of the charge complained of, it could have requested an explanatory charge. Thompson v. Magic City Trucking Service, 275 Ala. 291, 154 So.2d 306 (1963).
Citgo also contends that the trial court committed a reversible error when it permitted plaintiff's counsel to elicit from the defendant's witness, Moore, upon his cross-examination, evidence of Citgo's 1975 gross sales and 1970 net profit. Plaintiff maintains that this evidence was irrelevant to the issues and prejudicial to Citgo.
Moore's testimony on both is direct and cross-examination was extensive, aggregating fifty-one pages of the record. His evidence on direct examination established "very bad gasoline price markets (in 1971 and 1972) so the economics generally in business were very poor," prompting an analysis of the company's marketing methods and the ultimate decision to introduce a new distributor system. A part of this program included the closing of a refinery in East Chicago which diminished the company's supply of gasoline and affected the accounts which would not be renewed as well as the competitive price of their product. One of the problems the Company was attempting to solve was the effect upon it of distributors of private brand and unbranded products who marketed to large volume service stations.
On his cross-examination he disclosed that in 1971 the company sold gasoline at two prices, a branded price and an unbranded price, because some jobbers operated with both branded and unbranded products. Although he conceded that the company was selling to a few of the people who he complained were providing competition to his company, he maintained that "the competition was broader than the ones we weren't selling." At that point this exchange took place:
Q. You weren't getting your share of the marketof the unbranded market?
A. We weren't really a big factor in that.

*342 Q. How much was City Services sales last year?
MR. MORROW: We object to that now if it please the Court.
BY THE COURT: Overruled.
Q. You mean in terms of gallons?
A. Dollars.
A. Are you talking about petroleum products or
Q. Yes.
A. I don't know what the dollar number is.
Q. Do you know what the total revenue of City Services would be?
MR. MORROW: We object to that as
BY THE COURT: Overruled.
A. A total gross dollar sales on everything, chemicals, metals or petroleum products, the whole operation would probably be in excess of three billion dollars.
Q. Three billion dollars. Is that your idea of a small company?
A. I wasn't here when the reference was made but all things are relative.
Q. I'm not used to all those zero's. That's three thousand million in one year.
A. Yes, and I've already said that included a lot of chemicals and metal sales and in terms of petroleum we have something less than two percent of the national market.
And later, Moore was asked:
Q. Awhile ago, Mr. Moore, you said you said your profits hadn't been satisfactory. I am reading a publication called the Oil Week. Is that recognized in the industry?
A. Yes, I recognize it. It doesn't have very much statute in the industry, but I recognize it.
Q. It says in 1970 that y'all didn't make but 151 million net profit.
MR. MORROW: Now we object to that, Your Honor. He's already gone into a lot of information that has no pertinence to the case and now he is trying to go into earning segments of Cities Service.
BY THE COURT: Overruled.
Q. Is that correct?
A. I don't remember. It could very well be correct.
Q. I've got another publication right here. It's a National Observer of June 9, 1973, that quotes you, Mr. Moore. I want you to look at this and see if you made this statement, talking about whether the gasoline squeeze was a shortage or what. And it says right here
MR. MORROW: We would have to object to that. We are getting too far afield, and I don't want to make a whole lot of unnecessary objections but we're talking about something foreign from the case that happened long after.
Q. He says why they were cutting people off. Why they cut the Tom Griffins
BY THE COURT: Yea, I'll overrule the objection. Finish your question.
Q. The major oil companies deny any desire to harm the independents. And cite shortage of the crude oil and refining compacity [sic] quote, `Our first obligation is to supply branded jobbers and dealers who invest in stations that fly their company's flags and who have been loyal to us for years,' says Robert Moore, Vice-president of City Service Company. You said that to the press, didn't you?
A. I don't remember the occasion but it could well have been.
Q. Now tell me, Mr. Moore, where on that number among that criteria, who you're going to get rid of and who you're not going to get rid of, is the number of years with the company?
A. That's not on the criteria.
Q. Didn't make one particle of difference whether they had been with you one year or twenty-six years like Griffin?
A. It's an important factor but the criteria essentially had to do with the operation ability to be competitive.
Considering this testimony as a whole it is apparent that Moore's explanation of the marketing policy which led to the cancellation of Griffin's contract, and ultimately to this controversy, was a justification of the company's decision based upon *343 competitive factors. If the matters of the amount of the company's sales and profits were irrelevant and thus improper cross-examination in this fraud action, as the defendant contends, the subjects of sales and profits likewise would have been irrelevant on direct examination as well. Griffin's testimony on direct examination, however, dealt extensively with the company's marketing methods and poor economic position, a subject which intimately concerned the company's sales and profits. Assuming arguendo that these were irrelevant subjects for direct examination, because they were illicited at that stage of his examination Moore's cross-examination on the same subjects was proper. Irrelevant evidence may be admitted to rebut evidence of like character. Wilkinson v. Duncan, 294 Ala. 509, 319 So.2d 253 (1975); St. Clair County v. Bukacek, 272 Ala. 323, 131 So.2d 683 (1961); McElroy's Alabama Evidence § 14.01 (3rd ed.). And because Moore had painted a verbal portrait of the company's poor business position, we fail to see how any undue prejudice resulted to it when evidence of its gross sales and net profits was elicited from the same witness. Besides, defendant's counsel made only a general objection. We have shown that this evidence was admissible, hence the general objection was insufficient for the purposes of appeal. All American Life and Casualty Co. v. Dillard, 287 Ala. 673, 255 So.2d 17 (1971).
Citgo also contends that the trial court erroneously permitted the jury to find that Citgo had breached a contract granting the plaintiff an exclusive distributorship, or conspired to breach it, when there was no evidence of any such contract, or of any conspiracy. The defendant insists that one cannot be charged with conspiring to breach his own contract.
We fail to find anything in the trial court's instructions to the jury authorizing such a finding. The defendant's argument on this point springs from the court's reading the plaintiff's complaint to the jury:
The Plaintiff claims that on or about the 9th day of March 1972 the Plaintiff and Defendant City Service Oil Company, a corporation, entered into an agreement by which the Defendant, that Defendant, promised to supply the Plaintiff with gas and oil products, to make the Plaintiff a branded distributor of City Service products for one year beginning March 1, 1972 and further agree that the Plaintiff would have the exclusive distributorship in a designated geographic area, the same being approximately the width the northern half of Talladega County and all of St. Clair County, Alabama.
The Plaintiff further claims that the Defendant, City Service, breached that agreement by allowing or encouraging the Defendant, D. C. Boone and Boone Oil Company, to begin selling gas and oil products and otherwise distributing City Service brand named owned stations in Plaintiff's said exclusive sales area prior to the termination of the aforesaid contract on, to-wit, March 1, 1973.
The Plaintiff further claims that prior to June 1, 1972, the Plaintiff learned that the Defendant, Cities Service, was terminating some of its smaller distributors in the area, in other states, that on or about June 1, 1972, the Plaintiff inquired of the Defendant, Cities Service, whether its distributorship would be terminated.
The Plaintiff further claims that at the time of the Plaintiff's said injuries the Defendant, Cities Service, by and through its agents or employees made representations to the Plaintiff to the effect that the Plaintiff had no reason to worry regarding being cut off or terminated by Cities Service, but would retain his said distributorship.
The Plaintiff further says that the representations in the above paragraph as I have just stated to you by the Defendant, City Service, were false and that the Defendant, City Service, knew that they were false.
That at the time of the Plaintiff's aforesaid inquiries to Defendant, Plaintiff's distribution business was profitable, valuable and readily saleable business and *344 that the Plaintiff then had the capacity or opportunity to make arrangements for the distribution of competing petroleum products; but that shortly after October 1 of 1972 that Plaintiff's said opportunity to make other supply arrangements was no longer available, the business was no longer saleable and Plaintiff was then unable to make arrangements for the distribution of competing petroleum products.
The Plaintiff believed he says that the aforesaid representations of the Defendant, City Service, and relied upon said representations and in reliance thereon continued doing business with Cities Service, continued selling that Defendant's products as a branded distributor, did not sell his business and did not make arrangements for the distribution of competing petroleum products.
Plaintiff further claims that on or about the 10th day of October, 1972, the Defendant, City Service, informed him that City Service was exercising its option to terminate the Plaintiff's contract with the Defendant, City Service, in accordance with the terms of the March 9, 1972 contract and that on or about October 24, 1972, Plaintiff received a registered letter dated October 18, 1972, formally terminating his contract as of to-wit, March 1, 1972; that thereafter one Bob Moore, Cities Service's agent and its Marketing Vice President represented to the Plaintiff that Cities Service would not let anyone else in Plaintiff's sales area before Plaintiff was able to effect a sale of his business.
Plaintiff further says that subsequent to or after the conversation between Bob Moore and Plaintiff, but before the Plaintiff had been able to sell his business, Defendant City Service and defendants Boone Oil Company and D. C. Boone entered into an arrangement or agreement under which Boone Oil Company and D. C. Boone moved into Plaintiff's sales area, set up Cities Service branded dealers and otherwise interfered with the contract and business relationship between Cities Service and Plaintiff, and plaintiff and retail dealers who had theretofore purchased petroleum products from Plaintiff[.]
That the aforesaid representations made by the said Bob Moore, acting as an agent for Cities Service, were false and were known by the Defendant to be false and were made by that Defendant City Service without knowledge of the true facts, recklessly and for the purpose of deceiving Plaintiff.
Plaintiff believed the representations made by City Service's agent, Bob Moore, and in reliance upon said facts, did not sell his business prior to the time Defendants Boone Oil Company and D. C. Boone moved into the Plaintiff's sales area.
Plaintiff further says that Defendant, Cities Service and Boone Oil Company and D. C. Boone conspired to breach the contract between Cities Service and Plaintiff which was still in force at the time that Boone Oil Company moved into Plaintiff's sales area.

. . . . .
These were the only references to the contract and to conspiracy, and it is clear from the remainder of the charge that the issues submitted to the jury for their resolution concerned fraud, not breach of contract or conspiracy:
First I'll talk to you about fraud. Ladies and Gentlemen of the jury the Plaintiff in this case is claiming damages from the Defendants for an alleged legal fraud practiced upon him by the Defendants. And the fraud is charged in the Plaintiff's complaint which I have read to you just a few minutes ago. Of course, I have also explained to you the answer of the Defendants in this case. Now the complaint charges so far as fraud is concerned charges the Defendants with wilful misrepresentation. I charge you that if you are reasonably satisfied from the evidence that the Defendant wilfully misrepresented a material fact to the Plaintiff with the intent to induce the Plaintiff to act thereon and if the Plaintiff did *345 without knowledge of its falsity act upon said wilful misrepresentation to his injury then the Defendants would be guilty of legal fraud. Now if you find that there was a misrepresentation and if that misrepresentation was a wilful one as I have explained the law to youif you find that as your verdictit would be your responsibility to go a step further and to place damages against the Defendants for that fraud. Now if it is a wilful misrepresentation then the Plaintiff would be entitled to what is known in our law as punitive damages. The purpose of awarding punitive or exemplary damages is to allow money recovery to the Plaintiff by way of punishment to the Defendants and for the added purpose of protecting the public by deterring the Defendant and others from doing such wrong in the future. The imposition of punitive damages is entirely discretionary with the jury. That means you may make your own choice about it. Should you award punitive damages then in fixing the amount you must take into consideration the character and degree of the wrong as shown by the evidence in this case and the necessity of preventing similar wrongs. Now if that should be your verdict then you should assign damages in that respect you would be restricted in your verdict to an amount not to exceed $250,000.00, that being the amount that the Plaintiff claimed in his complaint.
Now the Court will charge you on reckless misrepresentation and this is another character or cata gory of fraud. I charge you that if you are reasonably satisfied from the evidence that the Defendant misrepresented a material fact recklessly without knowledge of the truth or falsity thereof and with the intent to induce Plaintiff to act and that Plaintiff acted upon said reckless misrepresentation to his injury then the Defendant is guilty of legal fraud. And your measure of damages in the event that you find in that respect for the Plaintiff would be one of compensatory damages. The compensatory damages that we recognize in this state by law are as follows and I so charge you:
The purpose of awarding compensatory damages is to fairly and reasonably compensate the injured party for the loss or injury sustained. Compensatory damages are intended as money compensation to the party wronged to compensate him for his injury and other damages which have been inflicted upon him as a proximate result of the wrong complained of. Of course complained of by the Plaintiff. One further element of the fraud so far as the law is concerned has to do with mistaken representation. I charge you if you are reasonably satisfied from the evidence that the Defendants innocently and wherever I might have used Defendant in my charge to you as to the definition of fraud if I've said Defendant I mean Defendants,satisfied from the evidence that the Defendants innocently or by mistake misrepresented a material fact to the Plaintiff thereby inducing action by the Plaintiff to his injury then the Defendants would be guilty of legal fraud and here again if that is your judgment and verdict after your consideration of all the evidence and you awarded damages to the Plaintiff under that it would be compensatory. Of course compensatory is the awarding of damages to compensate the injured party for the loss or injury that he has sustained based upon all of the evidence in that case.

. . . . .
Nowhere in the oral charge did the trial court refer to the law of either contracts or conspiracy. To the contrary, it is clear from that charge that the case was submitted to the jury on the issues of willful or reckless misrepresentation. The references to breach of contract and conspiracy were part of the court's references to the contentions of the parties, a practice condoned in this jurisdiction. Miller v. Bryant, 25 Ala. App. 564, 151 So. 362 (1933). Not only is it clear that the issues submitted to the jury did not involve breach of contract or conspiracy, but also we fail to discern any prejudice to the defendant when the trial *346 court did not charge the jury on the law of the plaintiff's allegations, since the plaintiff would have been entitled to an instruction had he been relying upon them and had they been supported by evidence. Jones v. Blackman, 284 Ala. 684, 228 So.2d 1 (1969). Indeed, there having been no evidence of either a breach of the contract or of a conspiracy, it would have been error for the trial court to have made either an issue for the jury. Cf. May-Bilt, Inc. v. Deese, 281 Ala. 579, 206 So.2d 590 (1967), and Barber v. Stephenson, 260 Ala. 151, 69 So.2d 251 (1953).
There being no reversible error, the judgment must be, and is, affirmed.
AFFIRMED.
BLOODWORTH, MADDOX, FAULKNER, JONES, ALMON, SHORES and EMBRY, JJ., concur.
TORBERT, C. J., dissents.
TORBERT, Chief Justice (dissenting):
I respectfully dissent. I believe that Griffin's cause of action based upon fraudulent misrepresentation was barred by the statute of limitations and that the trial court erred to reversal by failing to grant either Citgo's motion for a directed verdict or its motion for judgment notwithstanding the verdict.
Pursuant to the provisions of Title 7, section 42, Code of Alabama 1940 (§ 6-2-3, Code 1975), the statute of limitations for fraud is one year from the date that such fraud is discovered or should have been discovered. State Security Life Insurance Co. v. Henson, 288 Ala. 497, 262 So.2d 745 (1972). Further, facts which provoke inquiry in the mind of a person of reasonable prudence and which, if followed up, would have led to discovery of the fraud, constitute sufficient evidence of discovery. Johnson v. Shenandoah Life Insurance Company, 291 Ala. 389, 281 So.2d 636 (1973).
In the case at bar, Griffin discovered the alleged fraud more than one year prior to the commencement of his suit. Griffin's own testimony, which is quoted at length by the majority, shows that Citgo made allegedly fraudulent representations to Griffin during the summer of 1972 with respect to the renewal of his contract, that Griffin relied upon these representations by failing to obtain another source of gasoline and by failing to sell his business to a competitor during that summer when the business was still profitable and readily saleable, and, finally, that because of market fluctuations due to the gasoline shortages between the summer of 1972 and the first of October, 1972, Griffin suffered a $70,000.00 loss on the eventual sale of his business. Most importantly, however, this same testimony reveals without conflict that Griffin had knowledge of, and therefore discovered, the falsity of Citgo's representations no later than October 10, 1972, the date on which he received oral notification that his contract with Citgo would not be renewed.
Thus, from a review of the foregoing evidence, I cannot agree with the majority that the discovery of the alleged fraud did not occur until Griffin received written notification that his contract was to be terminated. Griffin was put on notice of the fraudulent nature of Citgo's representations by the oral statement of Ira Hughes just as effectively as by the written letter sent to him on October 18, 1972. The substance of both communications was the same, i. e., Griffin's distributorship agreement would not be renewed when his current contract expired.
In summary, I believe that Griffin's cause of action accrued, without dispute, no later than October 10, 1972, the date of the discovery of the alleged fraud. Thus, as the complaint was filed on October 18, 1973, Griffin's suit was clearly barred by the statute of limitation. I would hold, therefore, that a directed verdict would be proper in this case and would reverse. See State Security Life Insurance Co. v. Henson, supra.