Plaintiffs, Mr. and Mrs. Ford, sued Defendant for fraud and breach of warranty in connection with defects in a pool and concrete deck constructed for Plaintiffs by Defendant. Defendant now appeals from a judgment entered in favor of Plaintiffs on a jury verdict for $95,000. We affirm.
In the spring of 1980 Plaintiffs contacted Defendant regarding the construction of a pool at their home. Defendant subsequently met with Plaintiffs at their home to discuss pool construction and cost. During this meeting, Plaintiffs claim, Defendant stated that he had been in the construction business for over twenty years and represented himself to be an expert in several areas of construction work, including landscaping, plumbing, and concrete and electrical work. At this same meeting Defendant produced a written proposal listing the features to be included in the pool and stating the purchase price as $8,500. This proposal gave the dimensions of the pool and called for a concrete deck around the pool and a "30-mill" thick pool liner. The "30-mill" liner, claim Plaintiffs, was recommended by Defendant because it carried a longer warranty than thinner liners. Plaintiffs did not sign the proposal.
About two weeks after their meeting with Defendant, Plaintiffs told him to proceed with construction of the pool. Defendant's crew began work in early July of 1980 and completed the pool four days later. During construction, additional concrete was poured (at the request of Plaintiffs) to enlarge the pool deck, to provide a patio floor at one end of the pool, and to provide a concrete floor in Plaintiffs' garage. This additional concrete work was done "at cost." Mike Norris, an employee of defendant, was the supervisor of the project and was on the job site at all times during actual construction. Defendant visited the job site daily.
Approximately three days after the pool was completed, Defendant went to Plaintiffs' home and, according to Plaintiffs, had them sign a contract (which Defendant also signed), to be taken to the liner manufacturer to obtain a warranty on the pool liner. Plaintiffs also paid Defendant at this time.
The events which transpired after the summer of 1980 are remembered differently by the parties. During the fall of 1980, Defendant returned to Plaintiffs' home to assist them in closing the pool for the winter. Defendant claims that Plaintiffs expressed no dissatisfaction with the pool at that time. Plaintiffs allege, however, that *Page 536 
at that time they showed Defendant that the concrete around the pool was becoming discolored and was chipped and flaking in some areas. According to Plaintiffs, Defendant advised them that this condition was caused by hot weather and would not get any worse.
In May of 1981, says Defendant, Plaintiffs were paid a commission by Defendant when they agreed to refer prospective customers to Defendant. Plaintiffs claim that when they uncovered the pool in the spring of 1981 they discovered further discoloration of the concrete, two- to three-inch deep chips out of the concrete, and a bowed and cracked area at one end of the pool. Plaintiffs state that they made several attempts to contact Defendant and that after about four to six weeks Defendant came to their home, inspected the pool and walkway, and told them that the problems were probably caused by freezing and settling of the ground under the concrete and that the concrete mix appeared to Defendant to be "bad." Defendant further told Plaintiffs at that time, say Plaintiffs, that he would have his crew come and tear out the concrete, haul it off, and replace it. Plaintiffs claim, however, that Defendant called them back approximately one week later to say that the concrete finisher denied any problem with his work and that the concrete supplier had gone out of business. Plaintiffs further allege that in this same conversation Defendant told them they could not prove that he built the pool because there was no contract. According to Mrs. Ford, she asked Defendant for a copy of the contract but was told by Defendant that he would not help her to sue him and that he would tear up his copy of the contract.
Plaintiffs personally removed the concrete walkway and found that, contrary to Defendant's initial representations, there were neither wire reinforcements nor concrete pillars in or under the concrete for support. The contractor who replaced the concrete for Plaintiffs, who had been in the concrete business for 25 years, testified that a combination of bad concrete mix and the settling of the ground under the concrete, rather than extremes in temperatures, had caused the damage. He further testified that one side of the concrete walkway was sloped incorrectly and caused water to drain into the pool.
Plaintiffs also point out that Defendant's employee, Mike Norris, testified that a "20-mill" liner was used in Plaintiffs' pool because the "30-mill" liner had not been made at the time of installation.
Defendant, on the other hand, claims that Plaintiffs first complained to him about problems with the pool in the fall of 1981 (one and a half years after completion of the pool) when Defendant went to Plaintiffs' home, at their request, and was shown some flaking and chipping of the cement. It was then, alleges Defendant, that he offered to take up and replace the concrete, but, he says, Plaintiffs refused the offer.
Defendant testified that he gave a lifetime warranty on his labor and a one-year warranty on the concrete. (Mrs. Ford testified that Defendant verbally guaranteed his work for a "lifetime" and promised that he would "stand behind" the materials and the workmanship for as long as he was in business.) The parts that came with the pool were warranted by the manufacturer, as was the pool liner. Defendant maintains that Plaintiffs did not want to go to the expense of purchasing wire or steel rod reinforcement for the concrete and that no mention of reinforcement of this kind was made in the proposal.
Defendant's employee Norris was specifically responsible for supervising ground preparation before the concrete was poured. He testified at trial that the procedures used in building Plaintiffs' pool were identical to procedures he had used in preparing the ground for several hundred other pools. Defendant's concrete finisher, Ellis Maddock, testified that he had 24 years' experience in pouring and finishing and had worked on more than 1,000 pool decks. He also testified that he was present when the concrete was poured for *Page 537 
Plaintiffs' pool and that he had seen no problems with the concrete at that time.
Defendant raises three issues on this appeal: 1) Whether the trial court erred in denying his motion for directed verdict on the one-year statute of limitations ground; 2) whether the trial court erred in denying his motion for directed verdict based on an alleged failure of proof of Plaintiffs' fraud claim; and 3) whether the trial court erred in denying his motion for new trial on the issue of punitive damages.
Defendant first argues that the trial court erred in denying his motions for directed verdict and for judgment notwithstanding the verdict because the one-year statute of limitations, as set out in Code 1975, § 6-2-39,[1] had run before Plaintiffs filed suit, even considering the one-year "saving clause" of § 6-2-3.[2]
To be entitled to either directed verdict or J.N.O.V., Defendant must have proved to the trial judge that, from the evidence before the court at the time each motion was made, there was "a complete absence of proof on a material issue or [that there were] no controverted questions of fact on which reasonable people could differ," and that Defendant was entitled to judgment as a matter of law. Deaton, Inc. v.Burroughs, 456 So.2d 771, 773 (Ala. 1984). Stated conversely, the motions for directed verdict and J.N.O.V. should not have been granted if reasonable inferences in favor of Plaintiffs' claims could have been drawn from the evidence or if there was any conflict in the evidence for resolution by a jury.O'Donohue v. Citizens Bank, 350 So.2d 1049 (Ala.Civ.App. 1977).
We find that Plaintiffs' evidence was sufficient to raise a reasonable inference in support of their position that they did not discover a condition which put them on notice of possible fraud and breach of contract until, at the latest, the summer of 1981 — a time well within the twelve months preceding the day the suit was filed in May of 1982. Additionally, Plaintiffs presented evidence tending to show that, when they discovered slight damage when they closed the pool in the late summer of 1980, Defendant assured them that this small amount of discoloration and flaking would not worsen and was caused by hot weather — thereby inducing Plaintiffs not to make any investigation of the cause of the damage.
Plaintiffs proffered factual evidence tending to controvert Defendant's testimony. Further, whether Plaintiffs discovered or should have discovered the fraud earlier is a question properly left to the jury. Cities Service Oil Co. v. Griffin,357 So.2d 333 (Ala. 1978). Therefore, because there was evidence reasonably supporting both Plaintiffs' allegations of Defendant's misconduct and their claims as to when they discovered or should have discovered the alleged fraud, the trial court properly overruled Defendant's motions for directed verdict and J.N.O.V. and thereby implicitly found that a jury must "resolve the conflict in the evidence and . . . determine whether, on all the evidence, the statute of limitations created a bar to [Plaintiffs'] suit." Mitchell Homes, Inc. v.Tew, 294 Ala. 515, 518, 319 So.2d 258, 260 (1975). See, also,Loch Ridge Construction Co. v. Barra, 291 Ala. 312,280 So.2d 745 (1973).
Similarly, Defendant claims that the trial court erred in overruling his motions for directed verdict and J.N.O.V. because Plaintiffs failed to prove a prima facie case of fraud. Defendant argues that mere failure to perform a contract is not sufficient to prove the requisite intent to deceive in an action for fraud, citing Purcell Co. v. Spriggs Enteprises,Inc., 431 So.2d 515 (Ala. 1983), and that Plaintiffs have not proved that Defendant intended to defraud them. *Page 538 
Apart from the general representations of quality of materials and competency of workmanship, Defendant's proposition is made untenable by his substitution of the "20-mill" liner for the "30-mill" liner without either notifying Plaintiffs of the substitution or adjusting the contract price accordingly. Whether Defendant's conduct rose to a level sufficient to constitute "misrepresentation of a material fact made willfully to deceive, or recklessly without knowledge and acted on by the opposite party" was a question of fact for the jury. Hartselle Real Estate Insurance Co. v.Atkins, 426 So.2d 451, 453 (Ala.Civ.App. 1983).
The third issue raised by Defendant concerns the propriety of the amount of the damages award. Defendant claims that the trial court erred in overruling his motion for new trial because the $95,000 jury award necessarily included punitive damages — damages Defendant says were not properly recoverable under the facts of the instant action for misrepresentation. In other words, says Defendant, the amount of this verdict is so excessive in light of the evidence as to entitle him to a new trial. See General Sales Co. v. Miller, 454 So.2d 532 (Ala. 1984); Hall Motor Co. v. Furman, 284 Ala. 499, 234 So.2d 37
(1970).
Where the evidence supports a finding of deceit, made willfully or recklessly without knowledge, with the intent to injure, and acted on by the opposite party to his injury, the jury's verdict, including an award of punitive damages, carries a presumption of correctness. Furthermore, this presumption is strengthened when the verdict is left intact upon review by the trial court. From our careful review of the evidence and consideration of the reasonable inferences which the jury was free to draw therefrom, we are convinced that the trial judge did not abuse his discretion in denying Defendant's motion for new trial on the issue of excessive damages.
AFFIRMED.
TORBERT, C.J., and MADDOX, SHORES and ADAMS, JJ., concur.
[1] Section 6-2-39, Code 1975, was repealed effective January 9, 1985, and the actions governed by its one-year provisions were transferred to § 6-2-38, the two-year statute. See Act 85-39, § 1 and § 3, Ala. Acts Second Special Session 1984-85. But that amendment does not apply in this case.
[2] Act 85-39, § 2, also amended § 6-2-3, Code 1975, to allow a two-year "saving clause." Again, the effective date was January 9, 1985, long after the events in this case.