COBB, Chief Justice
(dissenting).
I respectfully dissent from the majority’s affirmance, without an opinion, of the summary judgment entered by the trial court in this case. I believe that the sum-rnary judgment was erroneous and that the facts of this case merit an opinion from this Court. On September 20, 2001, Edward L. Hardin, Jr., and Lila M. Hardin sued Dryvit Systems, Inc., and Richardson Construction Company, Inc. (collectively, “the defendants”), among others,[1] seeking damages based on the alleged improper installation of Dryvit’s exterior insulation finish system (“EIFS”) at the Hardins’ house. The Hardins asserted claims of breach of contract, fraud, breach of warranty, negligence, wantonness, and suppression against both Dryvit and Richardson Construction, the general contractor. After filing the original complaint in 2001, the Hardins discovered additional damage to their house in or around 2003. At that time, the Hardins removed the EIFS and replaced it with a hard stucco-finish product. When the EIFS was removed, they found additional damage attributable to the fact that the EIFS had failed to prevent the intrusion of water into their house in multiple places. The total cost of making repairs and replacing the EIFS was approximately $560,000. The Hardins amended their complaint in 2003 seeking additional damages and asserting claims arising from that discovery.
In 2004, Dryvit and Richardson Construction both moved for a summary judgment on the basis that the Hardins’ claims against them were time-barred by the applicable statute of limitations; they argued that the Hardins were on notice in 1997 of defects that had been identified in the EIFS. On May 23, 2005, the trial court entered a summary judgment for Dryvit and Richardson Construction, finding that the statute of limitations for all claims against them began to accrue no later than *448 September 1997 and that the Hardins’ September 20, 2001, action against the defendants was therefore time-barred. The trial court’s order provided, in pertinent part:
“Defendants rely primarily upon B & B Properties v. Dryvit Systems, Inc., 708 So.2d 189 (Ala.Civ.App.1997), for the proposition that the statute of limitations in this action commenced with the appearance of the rust spots and discoloration which occurred in 1994. The ruling in B & B has haunted EIFS cases since its issuance; not for its legal reasoning, but for the factual basis upon which the legal reasoning is premised. In the nine years since the commencement of the B & B suit, the evidence developed through the numerous EIFS cases which have worked their way through the courts of this state is that rust-spotting and discoloration on the surface of the EIFS is merely a correctable cosmetic problem, and does not ultimately lead to exterior system failure and to moisture related damages.
“B & B was decided early in the course of the development of EIFS litigation. The factual basis for the decision is that after Plaintiff B & B Properties discovered the surface discolorations in March 1992, ‘[t]he problem with the exterior system obviously was exacerbated over the next three years to the point that water damage to the interior of the building became visible.’ 708 So.2d at 192 (emphasis added). The Court then characterized the subsequent moisture intrusion as ‘the eventual damage that became apparent in 1995’ and held that ‘[t]he increase in the amount of damage from discoloration and blistering of paint to the eventual failure of the exterior system did not give rise to a new cause of action.’
“Almost ten years and hundreds of EIFS cases later, it is a virtually undisputed material fact that rust-spotting and discoloration, which has appeared in only a small number of cases, has no nexus with the endemic moisture problems found in the vast majority of cases. In most instances plaintiffs suffer no rust or discoloration damage, as this problem is the result of an isolated error in the manufacturing process, affecting only a limited quantity of the EIFS material produced by either Dryvit Systems or STO Corporation. The discoloration problem does not appear in the EIFS litigation which is ongoing against other manufacturers. The moisture problem, however, is the gravamen of most EIFS litigation, regardless of manufacturer, and irrespective of any prior surface discoloration.
[[Image here]]
“Contrary to Defendants’ contention in this case (and in the other EIFS cases), B & B does not appear to stand for the proposition that a Plaintiff’s cause of action accrues upon sustaining ‘actual damage (then apparent) however slight’ irrespective of the cause of that damage. B & B is unequivocally predicated upon an unbroken chain of events wherein the slight damage which became apparent (surface discoloration) inexorably leads to the subsequently claimed damages (system failure and interior moisture). This court, therefore, determines that the burden is upon the moving party to establish a causal chain of events in which the slight damage (then apparent) to Plaintiff ultimately resulted in the damage complained of in Plaintiffs complaint. Defendants cannot meet that burden in this case. The court finds that the discoloration which became apparent in 1994, did not commence the statute of limitations for the EIFS related moisture damage which did not become apparent until later.
*449 “Though moisture damage to Plaintiffs’ home became apparent in late 1995, there exist genuine issues of material fact as to whether or not this moisture damage was EIFS-related. In September 1997, however, Plaintiffs received a Jade Engineering inspection report which disclosed numerous defects in the EIFS as installed on their home. It is at this point in time that it became apparent to Plaintiffs that EIFS-related moisture damage, ‘however slight,’ existed in their home. The EIFS-related problems and remediation delineated in the Jade Engineering report far exceeded normal wear and tear and routine maintenance. The court, therefore, finds that the two-year, tort-based statute of limitations commenced in September 1997. See Chandiwala v. Pate Construction Co., 889 So.2d 540 (Ala.2004).
“Plaintiffs’ complaint was not filed until September 2001, some four years after Plaintiffs’ receipt of the Jade Engineering report which made apparent that Plaintiffs suffered EIFS-related moisture problems. Plaintiffs contend that the statute of limitations was tolled by the ongoing discussions which occurred subsequent to Plaintiffs’ receipt of the Jade Engineering report. It is incumbent upon Plaintiffs to proffer substantial evidence of conduct on the part of a defendant which constitutes either a fraudulent concealment which tolls the statute of limitations, or an affirmative inducement to Plaintiff which estops a defendant from pleading the statute of limitations. See, Mason v. County of Mobile, 410 So.2d 19 (Ala.1982); Seybold v. Magnolia Land Co., 376 So.2d 1083 (Ala.1979). The court finds that the ongoing negotiations in this case do not rise to the level of a fraudulent concealment which would toll the statute of limitations....
[[Image here]]
“The court finds that with respect to [Dryvit and Richardson Construction] Plaintiffs’ claims are barred by the statute of limitations (whether the applicable statute be two years for tort claims or six years for contract claims), as there exist no genuine issues of material fact, and [Dryvit and Richardson Construction] are entitled to judgment as a matter of law. Accordingly, the Motions for Summary Judgment filed by Defendants, Dryvit Systems, Inc., [and] Richardson Construction ... are hereby GRANTED and Summary Judgment is entered in favor of each of these Defendants and against Plaintiffs as to all claims asserted in Plaintiffs’ complaint. The court expressly directs entry of this judgment pursuant to [Ala.]R.Civ.P. Rule 54(b), as the court has determined that there is no just reason for delay in the entry of a final judgment for these defendants.”
The record reveals that the Hardins experienced numerous problems with their house after construction on it was completed in 1991. Among those defects were the appearance of rust stains on the EIFS sections of their house. In July 1994, the Hardins sent Dryvit a letter giving it notice of a “claim for breach of warranty and/or misrepresentation” relative to the EIFS and stating that “numerous problems are evident, and the value [of the house] has been substantially diminished.” A representative from Dryvit inspected the house, and the Hardins requested that Dryvit remove and replace the EIFS. The Hardins testified that the Dryvit representative advised them that Dryvit accepted responsibility for the rust stains; that the removal and replacement of the EIFS was not necessary; that the stains in the EIFS resulted from rust-causing particles in the finish; that the rust stains were merely cosmetic; that there were no *450 water, moisture-intrusion, or other problems with the EIFS; and that the discoloration problem could be corrected by “picking out” the stained material and refinishing the affected areas. Dryvit subsequently retained a contractor who removed the rust-stained material from the EIFS and refinished it in the manner recommended by Dryvit. As a result of the repairs and representations, the Hardins did not sue Dryvit or remove the EIFS where the rust stains had appeared.
However, in late 1995, water leaks were occurring in the interior walls of the home. The Hardins hired George C. Israel, Jr., an architect, to investigate the leaks. He opined that the interior-wall leaks might have resulted from improper flashing on two different portions of the house that used a flat-roof design, from water intrusion through tile and brick pavers, and from leaks that originated in an interior bathroom. Pursuant to Israel’s advice, the Hardins retained contractors to perform the interior repairs and to replace and repair portions of the roof. The Hardins presented evidence to the trial court indicating that the interior water leaks were not caused by a defect in the EIFS and that the damage resulting from those leaks had been repaired. In late 1996 or early 1997, the Hardins also noticed moisture collecting inside the insulated panes of the windows and doors, which were custom-made; they communicated with the subcontractor who had installed those components and had that condition repaired.
However, in 1997, the Hardins also observed that cracks had developed in the EIFS at various locations and rust staining in the finish similar to the condition that had occurred in 1994 had reappeared. The Hardins retained Joel D. Wehrman, a professional engineer employed by Jade Engineering, Inc. (“Jade”), to determine the cause and extent of those cracks. Instead of removing the EIFS, Wehrman examined the exterior condition of the home and conducted invasive-moisture testing in which he inserted an insulated probe through the walls at 87 areas of the exterior where the EIFS might be “suspect” or where moisture problems commonly occur in houses, such as in windowsills and wood trim around doors.
Wehrman summarized his impressions concerning the condition of the exterior in a 12-page report to the Hardins dated September 23, 1997, the “Jade Engineering report” referred to in the trial court’s order. The report provides, in pertinent part, that Dryvit manufactured EIFS as a barrier to prevent the intrusion of moisture. The EIFS was installed by gluing or nailing an expanded Styrofoam material to the solid substrate of the walls, whether plywood, cement board, masonry, or some other material. Then a cementitious base coat embedded with a fiberglass reinforcing mesh was applied over the Styrofoam. This base coat served as the primary moisture barrier. The installation of the EIFS was finished by troweling a polymer-based finish coat over the base coat to provide the exterior look of stucco. The Jade Engineering report also indicated that if moisture entered the wall cavity of an EIFS-coated structure, that moisture could be trapped behind the outer layer of that system, causing an accumulation of moisture that could result in soaking and rotting the wood framing in the walls behind the EIFS. Such moisture accumulation could also promote termite and fungus infestation. Although the EIFS itself is not usually susceptible to moisture damage, the moist conditions and subsequent rotting wood behind an EIFS exterior can go unnoticed for an extended period. The Jade Engineering report contrasted EIFS with other exterior finishes such as brick, noting that those finishes are not designed to prevent the intrusion of all moisture. *451 Rather those exterior finishes typically utilize cavity walls and flashing or seep holes to drain away moisture that might intrude. The record indicates that the EIFS at the Hardins’ house did not have a seep, drain, or other design feature that would allow any moisture that did penetrate the system to escape. Wehrman’s conclusions in the Jade Engineering report included the following:
“The buckling, cracking and moisture problems of the Hardin home are related to improper installation of the EIFS covering on the exterior of the home. The EIFS is not properly applied on the walls of the patio, and there are no expansion joints between the floor lines of the home or between dissimilar materials. Improper installation of the EIFS can result in moisture intrusion into the wall cavities of the home and subsequent wood rot. In my opinion, there is only one area which may have suffered structural damage from rot — the walls on the patio. The only other area where excessive moisture was detected was on a concrete block wall on the east side of the breezeway leading to the garage structure. Since there were no other moisture readings greater than 30 percent, I do not believe there is structural damage to the home at this time. Repairs should be made to the EIFS to prevent further moisture intrusion and subsequent structural damage.”
In 1997, the Hardins consulted Israel concerning the repairs recommended in the Jade Engineering report, and they subsequently engaged contractors, who made the recommended repairs. Pursuant to Israel’s recommendations and the recommendations in the Jade Engineering report, the EIFS was not removed from the house. In 1999, the Hardins observed more rust stains in the EIFS, and these stains appeared on all sides of the home. They contacted Dryvit concerning the stains as they had in 1994, and Dryvit agreed to repair the staining by picking out the stained material. Ed Hardin testified that representatives of Dryvit examined the EIFS and concluded that there were no structural problems or defects. As it had in 1994, Dryvit represented that the problems were merely cosmetic, and it would not agree to remove the EIFS as the Hardins requested. The Hardins subsequently brought the instant action.
In response to the defendants’ motion for a summary judgment, the Hardins presented the affidavits of both Wehrman and Israel concerning their understandings and recommendations to the Hardins based on the Jade Engineering report. Israel’s affidavit stated, in pertinent part, that his inspection did not reveal that the leaks that he had observed were the result of a problem with the EIFS. He stated: “In my opinion, based upon the available information and evidence at that time, I did not believe removal or replacement of the [Djryvit or EIFS was necessary or appropriate, and did not recommend such. There was simply not sufficient evidence to warrant such an undertaking, and in my opinion, it was not reasonable to do so.” He further affirmed that he had advised Ed Hardin that “he did not have a [Djryvit or EIFS problem.” Wehrman’s affidavit stated:
“I did not recommend removal of the [Djryvit, or exterior insulation finish system (EIFS), and I so advised Ed Hardin. I did not view the moisture readings as a cause for concern with regard to the house. I did not recommend that the Hardins tear off the [Djryvit, or EIFS, and replace wood, or put up new metal flashing, expansion joints, etc., at the house, based upon my observations and investigation. In my judgment at that time, the cracks and buckles I observed were not large or *452 significant enough to cause significant damage, and were not causing such. I concluded there was not significant damage that would justify the removal of the [Djryvit or EIFS. As stated, the only arguable exception was at the short patio wall, which was a small isolated area, given its location and the large size of the house. I did not feel the evidence or expense justified removal, given the likely extent of damage, if any, and I so advised Ed Hardin.”
Finally, Ed Hardin stated in his affidavit:
“Prior to our 2008 construction work, we were advised by our building industry experts, licensed by the State of Alabama, that it was not reasonable, necessary or appropriate to remove or replace the EIFS. We were advised that all leak and water damage problems had been identified, fixed, and repaired, and did not further exist. We were also advised by Dryvit on occasions in two different years that its EIFS product on our house had only cosmetic problems which Dryvit would correct, and that there were no moisture, water or other related problem attributable to the EIFS and Dryvit system. We did not consult Richardson [Construction] because it had emphatically told us that it would not come to our home and do any further work.”
The standard that controls this Court’s review of a summary judgment on appeal is well-settled:
“In reviewing the disposition of a motion for summary judgment, ‘we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,’ Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala.1988), and whether the movant was ‘entitled to a judgment as a matter of law.’ Wright v. Wright, 654 So.2d 542 (Ala.1995); Rule 56(c), Ala.R.Civ.P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). Evidence is ‘substantial’ if it is of ‘such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala.1993); Danners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala.1990).”
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala.1997).
The gist of this appeal is whether the trial court properly concluded that the Hardins’ fraud claims were barred by the two-year statutory limitations period for such claims, § 6 — 2—38(Z), Ala.Code 1975. Because that limitations period does not begin to run until the fraud is, or should have been, discovered, the critical question becomes is there a “genuine issue of a material fact” as to whether the Hardins knew or should have known of their claims concerning the EIFS as a result of the information contained in the Jade Engineering report in 1997.
The question of when a party discovers a cause of action based upon fraud is usually not appropriate for disposition on summary judgment:
*453 “The law in Alabama has long been that ‘[t]he question of when a party discovered or should have discovered fraud which would toll the statute of limitations is for the jury.’ Thompson v. National Health Ins. Co., 549 So.2d 12, 14 (Ala.1989) (quoting Vandegrift v. Lagrone, 477 So.2d 292, 295 (Ala.1985)); see, Hickox v. Stover, 551 So.2d 259 (Ala.1989); Deupree v. Butner, 522 So.2d 242 (Ala.1988); Davis v. Brown, 513 So.2d 1001 (Ala.1987); Myers v. Geneva Life Ins. Co., 495 So.2d 532 (Ala.1986); Elrod v. Ford, 489 So.2d 534 (Ala.1986); American Pioneer Life Ins. Co. v. Sandlin, 470 So.2d 657 (Ala.1985); Thomaston v. Thomaston, 468 So.2d 116 (Ala.1985); Osborn v. Johns, 468 So.2d 103 (Ala.1985); Ratledge v. H & W, Inc., 435 So.2d 7 (Ala.1983); Ryan v. Charles Townsend Ford, Inc., 409 So.2d 784 (Ala.1981); Sims v. Lewis, 374 So.2d 298 (Ala.1979); Cities Service Oil Co. v. Griffin, 357 So.2d 333 (Ala.1978); Mitchell Homes, Inc. v. Tew, 294 Ala. 515, 319 So.2d 258 (1975); Loch Ridge Construction Co. v. Barra, 291 Ala. 312, 280 So.2d 745 (1973); State Security Life Ins. Co. v. Henson, 288 Ala. 497, 262 So.2d 745 (1972); and Central of Georgia Ry. v. Ramsey, 275 Ala. 7, 151 So.2d 725 (1962). See, also, Independent Life & Acc. Ins. Co. v. Parker, 470 So.2d 1289 (Ala.Civ.App.1985); Wilson v. Draper, 406 So.2d 429 (Ala.Civ.App.1981); Jackson Co. v. Faulkner, 55 Ala. App. 354, 315 So.2d 591 (1975).
“The question of when a plaintiff should have discovered fraud should be taken away from the jury and decided as a matter of law only in cases where the plaintiff actually knew of facts that would put a reasonable person on notice of fraud. See, e.g., Sexton v. Liberty National Life Ins. Co., 405 So.2d 18 (Ala.1981); Seybold v. Magnolia Land Co., 376 So.2d 1083 (Ala.1979). In Sey-bold, the Court stated that ‘[i]t is sufficient to begin the running of the statute of limitations that [the] claimant knew of facts which would put a reasonable mind on notice of the possible existence of fraud.’ 376 So.2d at 1087 (citing Jefferson County Truck Growers Ass’n v. Tanner, 341 So.2d 485, 488 (Ala.1977)(plaintiff had actual knowledge of facts sufficient to provoke inquiry by a reasonable person).”
Hicks v. Globe Life & Accident Ins. Co., 584 So.2d 458, 463 (Ala.1991).
Although I would agree that the'Har-dins had knowledge of facts that would raise concerns about water damage to their house as early as 1994, the record in this case indicates that they investigated those concerns and that they received information supporting a reasonable belief that the EIFS was properly installed and was working properly and that the EIFS was not the source of the water problems. That is, in addition to the continuing representations from Dryvit that the EIFS had only cosmetic blemishes and that it was not a source of structural problems, both Wehrman and Israel stated that they did not understand the EIFS to be a source of the problems with the house at the time the Jade Engineering report was issued. Thus, the Hardins investigated the facts that might have put them on notice of problems with the EIFS' and received information that pointed to other sources for the problems with their house and that also indicated that the EIFS was sound.
In a comparable case, Dickinson v. Land Developers Construction Co., 882 So.2d 291 (Ala.2003), the homeowners in 1999 sued the builder of their house, alleging breach of contract, fraud, negligent or wanton inspection, breach of the warranty of habitability, and breach of an implied warranty of merchantability, based on the construction of their house. The home *454 owners asserted that the builder had made various promises and representations to them as to the quality of the construction, when, in fact, there were numerous defects in the house. The builder contended that the homeowners’ claims were time-barred. With respect to the homeowners’ claim that their house had suffered structural damage as a result of improperly installed support beam and foundation, the Court held that their reliance on the builder’s assurances that the problems had been repaired was sufficient to toll the two-year limitations period and warrant consideration of their fraud and negligence claims by the jury. Accordingly, the Court reversed the trial court’s summary judgment in favor of the builder. Similarly, in this case, the question whether the Hardins had knowledge sufficient, under the circumstances of this case, to put them on notice that the EIFS was defective at the time of the 1997 Jade Engineering report is a question of fact for the jury with respect to the Hardins’ fraud claims against the defendants.
With respect to the Hardins’ claims against the defendants based upon negligence, I note briefly that a determination of when a cause of action for negligence accrues under Ala.Code 1975, § 6-2-28(l), requires an analysis of when the Hardins reasonably had knowledge that the EIFS was defective or defectively installed. In light of the facts in this case to the effect that the Hardins were repeatedly informed that the EIFS was not the source of the problems they were having with their house, I believe that there is at least a question of fact whether the Jade Engineering report supplied them with such knowledge. Accordingly, I respectfully dissent from the no-opinion affirmance of the summary judgment in this case.

. The trial court certified its summary judgment for Dryvit and Richardson Construction as final pursuant to Rule 54(b), Ala. R. Civ. P., because claims against other defendants Te-main pending in the trial court. Those other defendants are not before the Court in this appeal.