[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 659 
In this insurance fraud case, the jury rendered a verdict for plaintiff, awarding $100,000 compensatory damages and $3,000,000 punitive damages. The defendant insurance companies raise numerous issues, which we shall consider in appropriate order.
The suit arises from the purchase by E. Kenneth Ayres of an annuity from American Pioneer Life Insurance Company (American Pioneer Life) in 1978. At the instigation of L. Paul McWhorter, Ayres cancelled three life insurance policies and withdrew the cash value thereof. Using this cash, Ayres invested $24,000 in a "Flexible Premium Annuity" issued by American Pioneer Life. This annuity was designed for a much smaller initial payment (generally $100 or less) and annual payments thereafter until retirement. McWhorter represented to Ayres that the annuity only required a one-time payment, that the full initial payment constituted the cash value of the annuity, and that Ayres *Page 660 
could withdraw his money with interest at any time.
In fact, the cash value of the annuity was only $12,000. It paid a 50% commission, which would have been much smaller if the payments were smaller, the term was shorter, or the annuity was in fact a single premium annuity. McWhorter filled out the application so that Ayres's grandson, Fred C. Sandlin, Jr., was the annuitant while Ayres was the applicant and beneficiary. This meant that Ayres was investing the $24,000 and giving it to his grandson, who would receive the annuity payments upon retirement forty years later. Without further premiums, the payments would be substantially reduced. In the event that Sandlin predeceased Ayres, Ayres would receive as a death benefit the amount paid in to the annuity plus a certain amount of interest. The application showed that Sandlin was 30 years old and that Ayres was his grandfather. Ayres was 69 at the time, although this did not appear on the application.
McWhorter was a registered agent of Lincoln National Life Insurance Corporation. He approached Ayres because he knew of Ayres's life insurance policy with Lincoln National, which was one of the policies McWhorter persuaded Ayres to cancel. McWhorter engaged in a series of transactions similar to this one, as evidenced by the testimony of ten witnesses in this case and by actions filed against him and various insurance companies in the Federal District Court for the Northern District of Alabama and consolidated as The McWhorter InsuranceCases, No. CV 83-P-1744-S. McWhorter has since filed for bankruptcy, so Ayres's action against him was stayed and is not at issue in this appeal.
When Ayres's application reached American Pioneer Life's offices in Orlando, Florida, Chuck Green, Agency Vice President, took it to Lois Johnson, Senior Underwriter, because, in Johnson's words, Green "wanted me to rush this policy through." Johnson became "upset" and refused to issue the annuity because she was being told to issue an annuity where the applicant had $24,000 and "the very minute I issued it it became worth $12,000." She took the application to Harold Pickett, Senior Vice President, who agreed that American Pioneer Life should not issue the annuity. Green, however, persuaded Derrell Haus, the president of American Pioneer Life, to overrule Johnson and Pickett.
American Pioneer Life issued the annuity in May 1978. When Ayres received it, he stored it in his safe deposit box. In August 1979, American Pioneer Life sent him a notice that his premium due on May 18 had not been received. McWhorter had previously assured him that any premiums were optional and that he could throw away any letters notifying him of premiums due, so he ignored it. In October 1981 Ayres tried to borrow money on the annuity, but his banker said the policy was not worth anything for a loan. Ayres filed this suit in December 1981 against McWhorter; American Pioneer Life; Milton L. Culver, American Pioneer Life's brokerage agent in Birmingham; and Underwriting Services of Alabama, Culver's agency.
On September 24, 1982, Ayres amended his complaint to include as defendants Lincoln National Life Insurance Company, Lincoln National Sales Corporation of Central Alabama, and American Pioneer Corporation, the parent company of American Pioneer Life.[1] McWhorter filed for bankruptcy on April 11, 1983, and the trial court stayed the action against him. The case went to trial against all other defendants on April 14, 1983. Underwriting Services of Alabama was dismissed as a defendant during trial. After a five-day trial, the jury returned a verdict of $100,000 compensatory damages against the remaining defendants and $3,000,000 punitive damages against all remaining defendants except Culver. Thus, the jury assessed punitive *Page 661 
damages against the two American Pioneer defendants and the two Lincoln National defendants.
These four defendants filed notice of appeal.[2] Before the case was argued and submitted, however, the Lincoln National defendants entered into a settlement agreement with Ayres's estate, Mr. Ayres having died after the trial. The American Pioneer appellants filed a motion to make the settlement agreement part of the record and for judgment in their favor on the grounds that the settlement amounted to a satisfaction of the judgment and therefore discharged the American Pioneer appellants from liability. They cite Butler v. GAB BusinessServices, Inc., 416 So.2d 984 (Ala. 1982); and Maddox v. DruidCity Hospital Board, 357 So.2d 974 (Ala. 1978).
In both of the cited cases, this Court upheld summary judgments for defendants who were sued subsequent to the satisfaction of "pro tanto judgments" against their joint tortfeasors. In both cases, the first-sued defendant paid the judgment and the plaintiff accepted it. The Court in Butler
held that "Payment of a judgment is satisfaction thereof." 416 So.2d at 986 (emphasis in original). The pro tanto release of Lincoln National, however, is only a partial satisfaction of the judgment under the express holdings of this Court in many cases, including Butler and Maddox, supra; Williams v.Colquett, 272 Ala. 577, 133 So.2d 364 (1961); and Steenhuis v.Holland, 217 Ala. 105, 115 So. 2 (1927). Code 1975, §12-21-109, requires that "All . . . releases . . . must have effect according to the intention of the parties thereto."
In Steenhuis v. Holland, supra, the Court clearly set out the circumstances under which claims against one joint tortfeasor are and are not barred by prior settlements with, releases of, judgments against, or satisfactions of judgments against, any other joint tortfeasor(s):
 "[R]ecovery against one followed by satisfaction is a defense to the other except as to costs — this upon the ground that the right of action is one and indivisible. Satisfaction extinguishes the demand. Likewise, full satisfaction by one without suit inures to the benefit of all, or, rather, cuts off the right of action by extinguishment.
 "On the other hand, it is the right of the injured party to accept satisfaction in part from one tortfeasor, release him, and proceed against the other. Such release operates in favor of such other only as satisfaction pro tanto.
". . . .
 "The law favors and encourages compromise. When the release shows it was in compromise of the liability of the party to whom given, with no reference to a full satisfaction as against others, we can see no just presumption that they had in mind a release of others in whom the released party had no interest. . . .
". . . .
 "In the case of Wright v. McCord, [205 Ala. 122, 88 So. 150 (1920)], there was an express reservation of right to pursue another tort-feasor. This stipulation was given effect. But such reservation is not essential, nor need the release take the form of a covenant not to sue. The true inquiry is, did the parties intend to limit the release to the parties named, with no intent that the cause of action be satisfied in full?"
Id., 217 Ala. at 107-108, 115 So. at 3-4 (citations omitted).
This right to release one joint tortfeasor has been recognized even in the cases where the Court has held that the action at bar was barred by a prior satisfaction. "The parties here could have entered into a pro tanto release agreement and preserved the [remaining] claims." Butler, supra, at 985. "Likewise, it is the right of the injured party to accept satisfaction in part from one tort-feasor, release him, and proceed against the other. Such release operates *Page 662 
in favor of such other only as satisfaction pro tanto." Maddox,supra, at 976.
The settlement agreement between the Ayres estate and Lincoln National is styled "Pro Tanto Release" and its content shows an intent only to release the Lincoln National defendants from liability. Fred Sandlin, Jr. executed the release as the executor of Mr. Ayres's estate, and the heirs, legatees, and beneficiaries of the estate executed an attached consent and ratification. The release specifically retains all claims against McWhorter, Culver, American Pioneer Life, American Pioneer Corporation, and the surety on American Pioneer's supersedeas bond. It includes nothing to indicate that it was intended to operate as full satisfaction of the claim, and much to the contrary.
The pro tanto release of Lincoln National does release American Pioneer to the extent of the settlement, $900,000, under the rule of the authorities discussed above. Because the release does not operate as a full satisfaction of the judgment, we deny the motion for judgment in American Pioneer's favor. We now proceed to the issues which American Pioneer raises in the principal appeal.
 The Statute of Limitations
American Pioneer Life pled the statute of limitations in its answer. American Pioneer Corporation filed a motion to dismiss the complaint because the action was barred by the statute of limitations. The trial court denied American Pioneer Corporation's motion to dismiss. Both defendants made and argued motions for directed verdict at the close of plaintiff's evidence, including as a ground the statute of limitations.
The gist of American Pioneer's argument is that Ayres should have discovered the alleged fraud more than one year prior to the time he filed suit. After Ayres received the annuity in May 1978, Pickett, the vice president who did not think it ought to issue, wrote a letter to him in August. Pickett testified regarding this letter:
 "As originally written I was a little stronger in my objection to this policy in trying to get through my objections and to Mr. Ayres to [sic] the fact that I didn't think it was in his best interest. In conjunction with this it was given to the agency department to edit. They came up with a draft that was similar to this [the letter that was sent] and this is the best I could get so I sent it out.
 "Q. Who was it in the agency department that was editing your letter?
"A. Mr. Chuck Green.
". . . .
 "Q. And what reason did he state he was editing your letter?
 "A. He didn't want me to upset the policy holders and perhaps lose the business."
American Pioneer sent the following letter with Mr. Pickett's signature:
"Dear Mr. Ayres:
 RE: Policy Number 28736 Annuitant — Fred C. Sandlin, Jr.
 "I would like to take this opportunity to thank you for your confidence in American Pioneer Life Insurance Company as evidenced by the contract you purchased for Fred C. Sandlin, Jr.
 "As your Agent (Paul McWhorter) explained, this is a long term means of amassing dollars through planned, annual contributions to the Flexible Premium Annuity. The actual accumulation will be dependent upon two factors — the interest rate paid and the frequency and size of your deposits.
 "If the deposits are maintained at the current level of $24,000 annually, you will have:
 Guaranteed Current Interest Rate* Interest Rate**
-------------- --------------- In 5 years $ 97,554.00 $103,370.00 In 10 years 259,035.00 301,594.00 In 20 years 675,696.00 947,484.00
* 6 1/2% for first 3 years; 4% thereafter.
** 7% — current interest is declared each year.
 "We truly respect your foresight in planning for a financially secure future, and please allow American Pioneer to be of assistance whenever possible." *Page 663 
None of the statements in this letter were so inconsistent with McWhorter's alleged representations about the policy as to persuade us to hold as a matter of law that Ayres should have inquired and discovered the fraud upon receiving this letter. In fact, with an understanding that premiums were optional, Mr. Ayres would hardly be likely to sense anything amiss from this letter.
Mrs. Johnson, the underwriter who was upset about the annuity, testified that she sent a letter to Ayres at the end of 1978 with the cash value of his policy underlined in red, but Ayres denied receiving this letter. He did acknowledge receiving the following letter, sent by a policyholders' service representative at American Pioneer Life on August 30, 1979:
 "We note that to this date we have not received the Annuity premium due on May 18.
 "As provided in the policy, until premium payments are resumed we are continuing the policy under the Paid Up Deferred Annuity Option. The cash value of the policy at this time is $12,840 and under this Option the cash value, accumulated at interest, will provide a reduced monthly income at Mr. Sandlin's age 65.
 "Please note that you may send any amount (minimum $100 per year) which will continue the policy on an active paying basis and enable Mr. Sandlin to receive the benefit of the increase in cash value thus recovering the initial investment at an earlier date.
 "We look forward to being of continued service to you and hope you will resume the premiums to the plan again shortly."
This letter has a stronger tendency to put Mr. Ayres on notice of facts which should have led him to discover the fraud, yet, under the circumstances, the trial court did not err in declining to rule that it constituted such notice as a matter of law. The letter makes a single reference to cash value in the course of discussing premium payments. At the time Mr. Ayres received the letter, he was seventy years old, he did not have much experience with insurance (he had worked in forestry and road construction), and he had been prepared by McWhorter to disregard letters requesting premiums. Mr. Ayres testified that he thought both letters were about optional premium payments, that he did not understand them, and that he disregarded them according to McWhorter's instructions. Thus, the question was for the jury whether these letters were sufficient to raise his suspicion to the extent that the statute of limitations should begin to run.
American Pioneer asserts that the trial court erred in instructing the jury on the statute of limitations because no instruction was given that Mr. Ayres could not recover against the American Pioneer defendants if, with reasonable diligence, he should have discovered the fraud more than one year prior to bringing the action. See Code 1975, §§ 6-2-3, 6-2-39; Torres v.State Farm Fire Cas. Co., 438 So.2d 757 (Ala. 1983); Retail,Wholesale and Department Store Employees Union, Local 453 v.McGriff, 398 So.2d 249 (Ala. 1981); Papastefan v. B L Const.Co., 385 So.2d 966 (Ala. 1980).
When American Pioneer objected that the court failed to instruct that the statute of limitations would begin to run at any time when Ayres should have discovered the fraud, the court responded, "One of the charges did." The court gave the following requested instruction for Lincoln National:
 "If you are reasonably satisfied from the evidence that the plaintiff knew or should have known that the representations made by — to him by L. Paul McWhorter in April or May of 1978 were false and that such knowledge was acquired by the plaintiff, or should have been acquired by the plaintiff, or should have been acquired by the plaintiff upon reasonable opportunity more than one year prior to September 24, 1982, then you cannot return a verdict in favor of the plaintiff against the defendants Lincoln National Life Insurance Company and Lincoln National Sales Corporation of Alabama." *Page 664 
Ayres argues that the jury, by returning a verdict against Lincoln National, necessarily found that the facts were not such that Ayres should have discovered the fraud more than one year prior to the time he brought suit. We agree that this is true — the statute of limitations began to run against all defendants at the same time. In fact, this instruction could conceivably have worked to the advantage of American Pioneer Life: it refers to the date of the amended complaint which added Lincoln National and American Pioneer Corporation as defendants.
We note also that American Pioneer did not submit a written requested instruction on this issue, so it has less grounds to object that the trial court did not specifically instruct the jury on this issue as to American Pioneer. Even though American Pioneer pointed out to the trial court that the written instruction pertained to Lincoln National, the trial court's decision not to call the jury back in to instruct it that the same principle applied to American Pioneer is not reversible error. If the jury had returned a verdict in favor of Lincoln National but against American Pioneer, American Pioneer would have grounds to complain. As it is, any error is harmless because the jury found in favor of Ayres on the question of whether he should have discovered the fraud prior to the time his banker told him the policy would not support a loan. Rule 45, A.R.A.P.
 Agency
American Pioneer asserts that McWhorter was not its agent. It argues that McWhorter was a licensed agent of Lincoln National; that as between Ayres and American Pioneer, he was Ayres's agent; and that Culver was American Pioneer's agent in the transaction. American Pioneer argues that McWhorter was not its agent under the statutory definition of an agent in the "Life and Disability Insurance Representatives" chapter of the Code title covering insurance:
 "An agent is a natural person, partnership or corporation appointed and authorized by an insurer to solicit applications or to negotiate for insurance or annuity contracts and to deliver policies or contracts on its behalf and, if authorized to do so by the insurer, to collect premiums in connection therewith."
Code 1975, § 27-8-1 (a).
The trial court, during arguments on the defendants' motions for directed verdicts, observed:
 "I think the general law of agency — not the law of insurance agency, is involved in this case. A broker may be an agent under the general law of agency. I think the insurance definition of agent is immaterial in this case."
The trial court's instructions to the jury included the following:
 "An agent is a person who by agreement with another, called the principal, acts for the principal and is subject to his control. . . . When an agent is engaged to perform a certain service whatever he does to that end or in furtherance of his employment is deemed to be an act done within the scope of his employment.
". . . .
 ". . . Implied authority of an agent is authority to do whatever acts or use whatever means are reasonably necessary and proper to the accomplishment of the purposes for which the agency was created. . ..
 ". . . Apparent authority for which a principal is responsible to a third person . . . for the act of his agent is that authority which arises when the principal by his acts, words, or conduct, reasonably interpreted, causes such third party to believe that authority had been given to an agent to act in his behalf and such authority cannot be established solely by the acts of the agent. . . . The agency is suspended during the time of the abandonment by the agent from the principal's business.
". . . .
 "In the absence of special circumstances an insurance broker is generally to be considered to be the agent of the insured in procuring a policy of insurance." *Page 665 
McWhorter was not a registered agent for American Pioneer when he sold Ayres the annuity, although he did become one a few months later. The comprehensive charge which the court gave to the jury on agency covered the possibility that McWhorter was "authorized by [American Pioneer] to solicit applications or to negotiate for insurance or annuity contracts." Section27-8-1 (a), supra. McWhorter sent the application to American Pioneer Life without Ayres's or Sandlin's signature. After approving the contract pending signatures (over Pickett's and Johnson's objections), American Pioneer returned the application to McWhorter for him to procure the signatures. McWhorter accepted Ayres's check for the premium, and the annuity states that "All premiums shall be payable in advance either at the Home Office of the Company, or to an authorized agent of the Company upon delivery of a receipt signed by the President or Secretary of the Company and countersigned by such agent."
American Pioneer cites Sellers v. Commercial Fire Ins. Co.,105 Ala. 282, 16 So. 798 (1895), for the proposition that McWhorter was Ayres's agent, not American Pioneer's. In that case, however, the evidence showed that Trimble and Co. were independent brokers and had no tendency to prove that they acted as agents for the insurance company. As noted above, there was disputed evidence in this case, so the question was for the jury.
The trial court gave an instruction as to insurance brokers, so the possibility that McWhorter was merely a broker was covered.
 Conspiracy
American Pioneer asserts that it was entitled to a directed verdict on Ayres's conspiracy count. There was evidence from which the jury could have inferred a conspiracy among McWhorter, Culver, and Green. Among the testimony in support of a conspiracy theory is that of Lois Johnson, who testified as to similar, later annuity applications which she questioned so strongly as to have Equifax Services investigate. The continuing participation of Culver and Green in these applications serves as inferential evidence of a scheme among them to issue fraudulent policies.
American Pioneer cites Tuskegee Institute v. MayRefrigeration Co., 57 Ala. App. 344, 328 So.2d 598 (1976), aff'din part and rev'd in part, 344 So.2d 156 (Ala. 1977), as holding that a corporation cannot conspire with its agents. We question whether this statement by the Court of Civil Appeals stands in light of this Court's reversal. This Court affirmed on the insufficiency of evidence of actual or apparent authority but reversed on the issue of ratification, all the while accepting the complaint's theory of a conspiracy between the corporation and its agents. Even Justice Bloodworth's dissent appears to accept the principle of such a conspiracy, but does not agree that the corporation can ratify its own conspiracy.
If the question were a conspiracy between McWhorter and American Pioneer as an abstract entity, we might agree with American Pioneer's position. As we stated above, however, the evidence would support a finding of a conspiracy among the agents of American Pioneer; or, for example, between McWhorter and American Pioneer through the actions of its vice president, Chuck Green. The court did not err in submitting Ayres's conspiracy count to the jury. American Pioneer did not object to the giving of Ayres's requested jury charge on conspiracy, so we need not address the propriety of that instruction.
 Fraudulent Concealment
On the next to the last day of trial, Ayres added Count IX as an amendment to his complaint:
 "Plaintiff avers that the Defendants by virtue of their superior knowledge, education and background and by virtue of the confidential relationship existing between the parties, were under an obligation to communicate to the Plaintiff all material facts. Plaintiff further avers that Defendants suppressed material facts which they were under an obligation *Page 666 
to communicate to Plaintiff and as a result of said suppression Plaintiff was induced to enter into the transaction herein questioned to his detriment.
 "Plaintiff, therefore, claims that as a proximate result of said conduct he was injured and damaged and whereby [sic] claims compensatory damages and punitive damages as herein set out."
American Pioneer complains that this was the first time any allegation of duty to disclose and suppression of material facts had been made against the American Pioneer defendants. Count VIII of the complaint raised such allegations against Lincoln National.
The court held a hearing on American Pioneer's motion to correct the record to reflect whether the court allowed Count IX or not. After much discussion, the court ruled, "in view of the fact that no ruling is required on this and it doesn't appear in the record that I . . . struck it, I'm going to leave it in."
The court's instructions to the jury include following references to duty to disclose and suppression:
 "Now, also, in one of the Counts the plaintiff charges that the defendants did not disclose to the plaintiff facts that he should have known. In other words, they are saying that things were withheld from the plaintiff. If you are reasonably satisfied from the evidence that the defendant concealed or withheld material facts from the plaintiff and without his knowledge of such material facts he acted to his injury, then the defendants would be guilty of a legal fraud. Here are the elements for this; there are four: There must have been a duty to disclose the facts; secondly, there must have been a concealment or non-disclosure of material facts by the defendant; third, the reason must be to induce the plaintiff to act; and fourth, some action by the plaintiff without these facts to his injury.
". . . .
 "Ladies and gentlemen, there are certain transactions — it is the duty of one party to disclose material facts to another party. And if under all of the surrounding circumstances to this transaction you find that the defendants, or any one of them, had a duty by reason of superior knowledge or other special circumstances in this case to disclose facts to the plaintiff, and if you are reasonably satisfied from the evidence that the defendant or defendants, or any one of them, failed to disclose facts to the plaintiff which they did not under these circumstances, then they have breached a duty and you would be allowed to find in favor of the plaintiff if he acted upon the facts that were not — or acted upon his lack of knowledge of existing facts."
These instructions do not distinguish between Lincoln National and American Pioneer, but we see no error. The allowance of Count IX against American Pioneer was proper under Rule 15 (b), A.R.Civ.P., "Amendments to Conform to the Evidence."
The testimony of Johnson and Pickett, which was the first testimony taken at trial, clearly raised the question of whether American Pioneer, under the circumstances of the application, was under a duty to disclose to Mr. Ayres the highly unusual and financially imprudent nature of purchasing the annuity in the amount requested. Among those circumstances which have not been set out above are Pickett's testimony that Alabama approved the annuity for payments only up to $7,500.00, and Johnson's testimony that the application pertained to an out-of-date annuity for which she had to retrieve a form from storage and which gave the agent a higher commission than similar annuities being issued at the time. American Pioneer cannot complain about the allowance of Count IX to conform to this evidence tending to establish a duty to disclose, because it did not object to this testimony on the grounds that it related to matters outside the pleadings nor to Pickett's testimony that Green and Haus objected to his contacting Ayres and edited his letter. *Page 667 
The evidence in this case supports a finding that American Pioneer had a duty to disclose the matters raising serious questions in the minds of two of its senior officers about the propriety of issuing this annuity. This duty arose under the principle that one party, in a superior bargaining position and with particular knowledge and expertise, has a duty to disclose material facts not known to the other party. Code 1975, §6-5-102; Jim Walter Homes, Inc. v. Waldrop, 448 So.2d 301 (Ala. 1983); and State Farm Mut. Auto Ins. Co. v. Ling, 348 So.2d 472
(Ala. 1977). In light of Johnson's and Pickett's conviction that the policy should not issue, American Pioneer should have informed Mr. Ayres of the unprecedented size of the annuity for which he was applying, the immediate loss of cash value, the fact that the Alabama Department of Insurance did not approve this annuity in so large an amount, and the other factors described above. Instead, American Pioneer approved the application and returned it for Ayres's and Sandlin's signatures and Ayres's check for $24,000.
 Testimony as to "Ethics"
American Pioneer objects that the trial court allowed Johnson and Pickett to testify that they thought issuing the annuity was unethical. This testimony was merely part of these two witnesses' description of why, as an executive officer and a senior employee of American Pioneer, they refused to issue the annuity. Furthermore, in the context of the testimony as a whole it was not error to allow this testimony.
American Pioneer, in its cross-examination of Pickett at the beginning of the trial, asked, "Did you know Mr. Haus to be an honorable man? A. Yes. Q. So you didn't have any reason to think that Mr. Haus was up to anything when he [told you to go ahead and issue the policy], did you? A. No." This question sufficiently opened the door on "ethics" that the trial court's later ruling allowing Ayres to ask such questions is not reversible error. Shortly thereafter, American Pioneer asked Pickett if he knew of anyone doing anything illegal in the issuance of the annuity.
Later, in redirect examination, Mr. Ayres's attorney asked Pickett if he thought the application was ethical. The court sustained an objection, and the attorney rephrased the question, "Would you say from your standpoint as a CLU — would you say this was an unethical application? A. Yes." No objection was made to this question, nor did American Pioneer move to exclude the answer. Ayres's attorney asked no further questions, but American Pioneer's attorney immediately thereafter extensively cross-examined Pickett on the question of ethics. After this cross-examination, the court granted American Pioneer's motion to exclude Pickett's answer. We see nothing in this exchange to which American Pioneer can object.
Later, during questioning of Johnson, she was asked if she thought issuing the policy was unethical. The court overruled an objection, and she answered that she though it was unethical. This again was a single question in the course of her testimony about her objections to the policy being issued. In light of how extensively the door had been opened during Pickett's testimony, we do not find that the court erred in overruling the objection. We note further, incidentally, that the court sustained objections to questions of whether Pickett and Johnson thought Green was an honorable man, an issue explicitly opened by American Pioneer with respect to Mr. Haus.
 Common Scheme Witnesses
Ayres introduced testimony of ten witnesses to whom McWhorter had sold ten annuities — two from American Pioneer, and eight from another insurance company. American Pioneer argues that the trial court erred in allowing these witnesses to testify as to the amounts of their losses under the holding of Cartwrightv. Braly, 218 Ala. 49, 117 So. 477 (1928). Ayres argues thatCartwright is distinguishable because in that case the testimony as to the amounts lost was not necessary to proof of fraudulent intent, while in this case such *Page 668 
testimony was necessary to establish the fraudulent nature of the transaction.
In Cartwright the defendant defrauded plaintiff and others by representing that defendant's bank was solvent and its assets were good, thereby inducing purchases of the bank's stock. The bank failed, causing plaintiff and his witnesses to lose money. Ayres points out that because the fact of the failure of the bank was sufficient proof of the fraudulent scheme, this Court held that admission of evidence of amounts lost was prejudicial error. Ayres argues that without the testimony of his witnesses that they in fact lost money due to McWhorter's representations and the sale of annuities to them, there would be no proof that the representations (as to recovery of principal, accumulation of interest, etc.) were false, and thus the testimony would not have tended to prove a common scheme.
We think this distinction is sound. The complicated nature of these annuities made it proper for Ayres to present to the jury the common elements of these transactions. The two witnesses who had purchased American Pioneer annuities were retired, elderly persons who invested over $20,000 each into the same type of flexible premium annuities, from which they lost fifty percent of their investment. These transactions took place within two months after Ayres bought his annuity. Lois Johnson testified that she took exception to these and other such sales, to the extent that she requested Equifax investigations into the financial status of some of the applicants. The specifics of the losses were thus an integral part of the proof of the fraudulent scheme and it was not error for the court to allow this testimony.
The court instructed the jury that the testimony from the eight other witnesses was relevant to Ayres's action against Lincoln National, but not to the claims against American Pioneer. Ayres had some thirty other witnesses available to testify, but the court cut off this line of testimony.
 The Claim Against American Pioneer Corporation
American Pioneer Corporation argues that it could only be held liable as the owner of the stock of American Pioneer Life Insurance Company if Ayres had shown that American Pioneer Life was a mere instrumentality of American Pioneer Corporation, and insists that there was a total lack of proof on this point. The principle of this argument is correct, but the allegation as to the lack of proof is not. Ayres introduced the deposition of Grant C. Hunt, who was president of American Pioneer Life at the time of trial and who until shortly before had also been vice president of American Pioneer Corporation. He stated that in those capacities he ran the day-to-day operations of both corporations. Mr. Hunt's deposition spoke of regular transfers of funds between American Pioneer Corporation and American Pioneer Life and a complete overlap of the executive committees of the two corporations.
Not only do we find that Hunt's testimony presented at least a scintilla of evidence that American Pioneer Life was the alter ego of American Pioneer Corporation, but we also find that American Pioneer Corporation did not preserve any error on this issue. It made a general motion for directed verdict on the ground that there was no evidence connecting it to the transaction, but in view of the "alter ego" allegation of the complaint and the evidence tending to prove that allegation, the court did not err in denying the motion.
 The Verdict Form and Damages
American Pioneer argues that the court erred in submitting verdict forms to the jury which only allowed one amount for compensatory damages against all defendants whom the jury found liable and one amount for punitive damages against all defendants subject thereto. American Pioneer insists that the evidence was different against the various defendants and thus the court should have given the jury separate forms. The only action taken by American Pioneer at trial, however, was to request the court to give the jury verdict forms as to each count (not each defendant). American Pioneer made no objection *Page 669 
and took no exception even on this ground, much less on the issue now argued, so nothing is presented for our review.
American Pioneer also argues that the damages were excessive. The trial court overruled American Pioneer's motion for new trial or remittitur, however, and we see no reason to disturb that decision in light of the evidence of the intentional, gross, and oppressive nature of the fraud.
American Pioneer has filed a motion for reduction of the supersedeas bond because of the pro tanto settlement by Lincoln National. The bond came up for renewal after the pro tanto settlement and American Pioneer sought to pay its surety a premium only on the judgment as reduced by the settlement. We are informed that American Pioneer and its surety have agreed to base the premium on this Court's decision on this motion.
Such a reduction is appropriate under the posture of this case. The question, after the pro tanto settlement, was whether American Pioneer would be totally discharged or have its liability reduced by the $900,000 settlement. Thus, the bonding company was subject to liability only on the $2,200,000 potential liability of American Pioneer after the settlement, and its premium should be reduced accordingly. Ayres' objection in the trial court to such a reduction was that an order to that effect might constitute a satisfaction of the judgment and discharge American Pioneer. There is no such problem in the case as now postured. We therefore grant the motion.
The judgment of the trial court is affirmed.
AFFIRMED.
TORBERT, C.J., and FAULKNER, JONES, SHORES, EMBRY, BEATTY and ADAMS, JJ., concur.
MADDOX, J., concurs specially.
[1] We shall refer to "American Pioneer" or "the American Pioneer defendants" only for positions taken equally by the two parties.
[2] The American Pioneer defendants are represented on appeal by counsel different from their trial counsel.