623 So.2d 1156 (1993)
Ganus GRAY
v.
LIBERTY NATIONAL LIFE INSURANCE COMPANY.
1911246.
Supreme Court of Alabama.
July 30, 1993.
*1158 Edward F. Morgan, Tuscaloosa, for appellant.
Scott Donaldson of Donald, Randall, Donald & Hamner, Tuscaloosa, for appellee.
Jack Drake of Drake & Pierce, Tuscaloosa, for amicus curiae Alabama Trial Lawyers Ass'n.

ON APPLICATION FOR REHEARING
STEAGALL, Justice.
This Court's opinion of December 18, 1992, is hereby withdrawn and the following is substituted therefor.
Ganus Gray sued Liberty National Life Insurance Company ("Liberty National"), alleging that the company had fraudulently withdrawn money from his bank account to pay the premiums on a life insurance policy he had not purchased.[1] Gray also alleged claims for conversion, trespass to a bank account, and the tort of outrage. Liberty National filed a motion for summary judgment. After a hearing on the motion, the trial court determined that the fraud claim was barred by the statute of limitations and that Gray had failed to support his conversion and outrage claims with substantial evidence. The court entered a summary judgment for Liberty National on those three claims. The court did not resolve the issue of trespass, but made the summary judgment final pursuant to Rule 54(b), Ala.R.Civ.P. Gray appeals.
A summary judgment is proper and must be affirmed on appeal if there is no genuine issue of material fact and that moving party is entitled to a judgment as a matter of law. Rule 56, Ala.R.Civ.P; Lee v. City of Gadsden, 592 So.2d 1036 (Ala.1992). If the moving party makes a prima facie showing that no genuine issue of material fact exists, then the burden shifts to the nonmovant to present substantial evidence in support of his position. Lee.
We begin by noting these facts from the record: Gray began buying various insurance policies from Liberty National in 1944. In 1963, Gray authorized Liberty National to draft his bank account in order to pay itself for premiums due on the policies. Gray executed an "Authorization to Honor Checks Drawn By Liberty National Life Insurance Company, Birmingham, Alabama," as well as a "Request for Bank Budget Premium Check Plan." Liberty National thereafter sent a letter to Gray and his bank, notifying them that the company would begin drafting the account for the amount of the premiums. Gray bought additional policies at different times and re-executed the automatic bank draft forms. Liberty National then sent him notice letters to inform him that the authorized drafts would begin. Liberty National thereafter withdrew the amount of the premiums from his account each month by executing a draft instrument for the proper amount. The bank recorded the withdrawal on Gray's bank statement and sent him the separate draft instrument along with his other canceled checks each month.
In 1977, Gray's son Jeffery graduated from high school and began college. During a Christmas vacation, a Liberty National agent talked to Jeffery about life insurance. Jeffery *1159 signed an application for a policy and paid the initial premium to the agent. The agent's report, which he filed along with Jeffery's application, stated that a "Bank Budget Card will be forwarded later."
Neither Jeffery nor his father ever received any documents from Liberty National concerning the policy. In January 1978, however, Liberty National began to withdraw $10.86 from Ganus Gray's bank account each month to pay for Jeffery's policy. Jeffery did not authorize this action, and his father did not know the policy existed. Liberty National did not send a letter of notice to Gray, but continued to withdraw $10.86 per month from his account for the next 12 years, adding this amount to Gray's existing monthly premium of $18.75. Liberty National did not issue a separate draft instrument for the new policy; rather, it merely increased the amount on the single draft instrument by $10.86.
In March 1990, Gray retired from work and stopped all automatic drafts on his bank account. Thereafter, Liberty National sent a letter of notice addressed to Jeffery, informing him that his policy was about to lapse for delinquent premiums and that Liberty National itself had been paying the premiums each month since March under an "automatic loan receipt" provision contained in the policy. In July 1990, Jeffery sent a letter to Liberty National, stating that he had never received the policy he applied for and that he had not authorized payment for the policy through his father's bank account. In response, Liberty National returned his initial premium of $10.86 that he had paid with his application in 1977. The company sent a check to Ganus Gray in the amount of $1,681.35, which represented $1,585.56 in premiums and $95.79 in interest (6%). Gray requested another 6% interest, and Liberty National complied. He thereafter filed this action.
Gray first argues that the trial court erred in determining that his claim for fraudulent misrepresentation was barred by the statute of limitations. At the time the alleged misrepresentation began in 1978, a claim for fraud was subject to a one-year statute of limitations. Ala.Code 1975, former § 6-2-39. Effective January 9, 1985, the Alabama legislature amended § 6-2-3 and repealed § 6-2-39. Lader v. Lowder Realty Better Homes & Gardens, 512 So.2d 1331 (Ala.1987). This change placed fraud actions within § 6-2-38, which provides for a two-year period of limitations; actions that had been barred as of January 9, 1985, by the one-year statute of limitations were not revived by the transfer of fraud actions to the two-year statute or by the corresponding amendment to § 6-2-3. Lader.
Under § 6-2-3, a fraud claim accrues at the time of the discovery by the aggrieved party of the fact constituting the fraud. Lader. The time of discovery of a fraud claim is the time when the party actually discovered the fraud or had facts that, upon closer examination, would have led to the discovery of the fraud. Lader. "[F]raud is discovered as a matter of law ... when one receives documents that would put one on such notice that the fraud reasonably should be discovered." Hickox v. Stover, 551 So.2d 259, 262 (Ala.1989).
It is undisputed that Gray received bank statements as early as January 1978 that clearly showed that Liberty National was withdrawing an additional $10.86 per month. He also received copies of the actual draft instrument, showing the increase in the amount of premiums and the number of policies. In March 1978, the increased Liberty National withdrawal actually caused an overdraft of Gray's account, for which he paid a fee to the bank. For the next 12 years, Gray continued to receive detailed bank statements that, upon a cursory examination, would have revealed that Liberty National was withdrawing premiums for an additional policy. He also continued to receive canceled drafts for this amount. The record shows that Gray is literate and that he was capable of managing his affairs throughout this 12-year period. Based on these facts, we must conclude that a reasonable person of ordinary prudence would have discovered the alleged fraud in 1978 or within one year thereafter. Accordingly, we find no error in the trial court's entry of the summary judgment as to this claim, based upon the statute of limitations.
*1160 The next issue raised is whether the trial court erred in entering the summary judgment as to Gray's claim of conversion. To constitute conversion, there must be a wrongful taking, an illegal assumption of ownership, or an illegal use or misuse of another's property. Gillis v. Benefit Trust Life Ins. Co., 601 So.2d 951 (Ala.1992). An action alleging conversion of cash lies only where the money involved is "earmarked" or is specific money capable of identification, e.g., money in a bag, coins or notes that have been entrusted to the defendant's care, or funds that have otherwise been sequestered, and where there is an obligation to keep intact and deliver this specific money rather than to merely deliver a certain sum. Gillis. In Gillis, this Court determined that money received by use of pre-authorized checks drawn monthly by an insurer against the insured's checking account to cover premiums for a specific insurance policy is "identifiable" for purposes of maintaining a claim for conversion. In view of Gillis, we hold that the money paid on the pre-authorized checks Liberty National drew monthly against Gray's bank account was "identifiable" money; thus, Gray may maintain an action for conversion here. The record reveals substantial evidence to establish the elements of the claim; accordingly, the summary judgment is reversed as to the conversion claim and the cause is remanded for further proceedings on that claim.
Gray next argues that the trial court erred in entering the summary judgment for Liberty National on his claim alleging the tort of outrage. In order to sustain this claim, Gray must establish by substantial evidence that Liberty National, by extreme and outrageous conduct, intentionally or recklessly caused him severe emotional distress. American Road Service Co. v. Inmon, 394 So.2d 361 (Ala.1980). "Extreme conduct" is defined as "conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." Inmon, 394 So.2d at 365. The extreme conduct must result in emotional distress "so severe that no reasonable person could be expected to endure it." Id. Mere annoyances or indignities are not enough to make a defendant liable for extreme and outrageous conduct. Barrett v. Farmers & Merchants Bank, 451 So.2d 257 (Ala.1984).
In deposition testimony, representatives of Liberty National testified that the company's withdrawals for Jeffery's policy were made because of an inadvertent mistake and that the company repaid the amount with interest as soon as it discovered the error. Gray produced no substantial evidence to rebut this testimony and to establish that Liberty National's conduct went beyond the bounds of decency. Moreover, Gray did not present substantial evidence to establish that Liberty National's error caused him any extreme emotional distress. In view of this, the trial court properly concluded that Liberty National was entitled to a judgment as a matter of law on the outrage claim.
ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; APPLICATION GRANTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
MADDOX, ADAMS, HOUSTON, KENNEDY and INGRAM, JJ., concur.
HORNSBY, C.J., and ALMON, J., concur in part and dissent in part.
SHORES, J., recused.
HORNSBY, Chief Justice (concurring in part; dissenting in part).
I concur with the majority's holding that the summary judgment is due to be affirmed as to Gray's outrage claim and reversed as to his conversion claim. However, for two reasons, I must respectfully dissent from the majority's holding affirming the summary judgment as to Gray's fraud claim.
The majority holds that, as a matter of law, Gray's fraud claim is barred by the statute of limitations because "a reasonable person of ordinary prudence would have discovered" Liberty National's allegedly fraudulent acts "in 1978 or within one year thereafter." 623 So.2d at 1159. My initial concern with the majority's analysis is that it ignores *1161 the fact that Liberty National made a separate and distinct unauthorized draft against Gray's checking account each month from February 1978 until March 1990; each of those unauthorized drafts would have given rise to a separate fraud claim. Cf. King Homes, Inc. v. Roberts, 46 Ala.App. 257, 240 So.2d 679, cert. denied, 286 Ala. 736, 240 So.2d 689 (1970) (court held that each act of repair gave rise to a separate negligence cause of action). Thus, even if a reasonable person in Gray's position would have discovered the first unauthorized draft, Gray's failure to bring an action within one year of that draft has no effect on his right to commence a fraud action to recover based on unauthorized drafts after February 1978. Section 6-2-38 grants Gray two years from the date of each unauthorized draft made after January 9, 1985, to commence a fraud action thereon. Section 6-2-3, upon which the majority's analysis focuses, is only a "saving clause," serving no purpose when the claimant has commenced his action within two years from the date of the fraud. See Williams v. Mertz, 549 So.2d 87 (Ala.1989). Therefore, regardless of when Gray discovered, or should have discovered, each unauthorized draft, he is entitled, at the least, to have a jury consider his fraud claim as to those unauthorized drafts that Liberty National made within the two-year period before Gray filed this action on November 14, 1990. See Garrett v. Raytheon Co., 368 So.2d 516, 521 (Ala.1979) (limiting recovery to the those acts that occurred within the limitations period); see also American Mutual Liability Ins. Co. v. Agricola Furnace Co., 236 Ala. 535, 183 So. 677 (1938); Howell v. City of Dothan, 234 Ala. 158, 174 So. 624 (1937).
Also, in light of the fact that Gray alleges, and supports by evidence, that he had no actual knowledge until August 1990 that a portion of Liberty National's monthly drafts over a 12-year period were unauthorized, I disagree with the majority's determination that, as a matter of law, a reasonable person in Gray's position would have discovered the first unauthorized draft. I believe this determination is a question of fact for the jury.
Section 6-2-3 operates when a fraud action would otherwise be barred under § 6-2-38 and grants that party two years from the time of the discovery of the fact constituting fraud to commence an action. The issue of when a fraud is discovered, for the purpose of the running of the limitations period under § 6-2-3 was discussed at length in the context of a review of a summary judgment in Hicks v. Globe Life & Accident Ins. Co., 584 So.2d 458 (Ala.1991). Essentially, "the law in Alabama has long been that `[t]he question of when a party discovered or should have discovered fraud which would toll the statute of limitations is for the jury.'" Thompson v. National Health Ins. Co., 549 So.2d 12, 14 (Ala.1989) (quoting Vandegrift v. Lagrone, 477 So.2d 292, 295 (Ala.1985)); see Hickox v. Stover, 551 So.2d 259 (Ala.1989); Deupree v. Butner, 522 So.2d 242 (Ala.1988); Davis v. Brown, 513 So.2d 1001 (Ala.1987); Myers v. Geneva Life Ins. Co., 495 So.2d 532 (Ala. 1986); Elrod v. Ford, 489 So.2d 534 (Ala. 1986); American Pioneer Life Ins. Co. v. Sandlin, 470 So.2d 657 (Ala.1985); Thomaston v. Thomaston, 468 So.2d 116 (Ala.1985); Osborn v. Johns, 468 So.2d 103 (Ala.1985); Ratledge v. H & W, Inc., 435 So.2d 7 (Ala. 1983); Ryan v. Charles Townsend Ford, Inc., 409 So.2d 784 (Ala.1981); Sims v. Lewis, 374 So.2d 298 (Ala.1979); Cities Service Oil Co. v. Griffin, 357 So.2d 333 (Ala.1978); Mitchell Homes, Inc. v. Tew, 294 Ala. 515, 319 So.2d 258 (1975); Loch Ridge Construction Co. v. Barra, 291 Ala. 312, 280 So.2d 745 (1973); State Security Life Ins. Co. v. Henson, 288 Ala. 497, 262 So.2d 745 (1972); and Central of Georgia Ry. v. Ramsey, 275 Ala. 7, 151 So.2d 725 (1962). See, also, Independent Life & Acc. Ins. Co. v. Parker, 470 So.2d 1289 (Ala.Civ.App.1985); Wilson v. Draper, 406 So.2d 429 (Ala.Civ.App.1981); Jackson Co. v. Faulkner, 55 Ala.App. 354, 315 So.2d 591 (1975). Further, "[t]he question of when a plaintiff should have discovered fraud should be taken away from the jury and decided as a matter of law only in cases where the plaintiff actually knew of facts that would put a reasonable person on notice of fraud." Hicks, 584 So.2d at 462. These legal principles support Gray's contention that, under the facts of this case, a jury should determine whether an ordinary person of reasonable prudence in Gray's position should have discovered that Liberty National *1162 was making unauthorized drafts from his checking account.
Gray had 12 policies of insurance with Liberty National over the period 1944 to 1978. In 1963, he executed the first of five agreements with Liberty National authorizing it to automatically draft, by pre-authorized check, money from Gray's checking account to pay itself insurance premiums. Gray had three checking accounts at the same bank, and he alleges that over the years Liberty National's automatic draft power had been transferred from one account to another. On August 29, 1972, Gray executed the last agreement authorizing Liberty National to draft premiums for three different policies of up to $30.00 per month.
For some time before February 1978, Liberty National had drafted $18.75 from Gray's checking account, and Gray had received in his monthly bank statement a canceled pre-authorized check payable to Liberty National for that amount. In February 1978, when Liberty National began drafting $10.86 per month from Gray's account to pay premiums for his son Jeffery Gray's insurance, it did not use a separate pre-authorized check. It merely increased the amount of the draft it was already drawing against Gray's account. Although the majority emphasizes the significance of that $10.86 increase, a jury could find that a reasonably prudent person in Gray's position would have concluded that the increase was authorized.
Liberty National contends that its unauthorized drafts from Gray's account were the result of an inadvertent mistake that it failed to discover for 12 years. I do not understand how the majority can, as a matter of law, charge Gray with discovery of a fact that Liberty National, an insurance company in the business of record keeping, overlooked for 12 years.
For the foregoing reasons, Gray's fraud claim should be submitted to a jury.
ALMON, Justice (concurring in part and dissenting in part).
I agree that the summary judgment is due to be affirmed as to the outrage claim and reversed as to the conversion claim. I dissent from the affirmance of the summary judgment as to the fraud claim. The complaint alleged that Liberty National had fraudulently misrepresented that it was authorized to withdraw funds from Gray's account in March 1990 and in every preceding month for approximately 12 years. This action was filed on November 14, 1990, long before the two-year period of limitations had expired on the last fraudulent acts alleged to have been committed by Liberty National. If for no other reason, the summary judgment on the fraud count should be reversed because of the allegation, supported by the plaintiff's evidence, that Liberty National committed fraudulent acts within the period of limitations.
NOTES
[1] Gray did not sue the bank.